## The State of Kansas v. Daniel Countryman.

### No. 10683.

1. PRELIMINARY EXAMINATION — *papers and justice's docket-entries highest and best evidence of.* A complaint, before a justice of the peace, charging an assault with intent to kill, followed by a warrant of arrest which recites such complaint in full, with docket entries showing arraignment, plea of not guilty, findings of the commission of such offense and of probable cause to believe the defendant guilty thereof, together with orders of commitment and fixing the amount of bail, are not only full and sufficient evidence of a preliminary trial, but are the highest and best evidence of such trial.

2. TERMS OF COURT IN TWENTY-THIRD DISTRICT — *Ch. 107, laws 1895, repealed by implication ¶ 2040, Gen. Stat. 1889, as to.* Chapter 107, Laws of 1895, fixing terms of court in all the counties of the twenty-third judicial district, repeals by implication section 20, chapter 118, Laws of 1889, (¶ 2040, Gen. Stat. 1889,) upon the same subject, and is a substitute for the earlier enactment.

3. CHARIVARI PARTY — *shooting a member of, an offense under §42 of Crimes Act.* One may, if necessary, defend himself and his family, with deadly weapons, from a felonious assault, and may also defend his habitation from such character of assault, by the use of like weapons, if necessary to preserve the same from destruction or serious injury; but a non-felonious assault upon one's person, family, or habitation, that is, an assault not made under such circumstances, and with such means, and under such appearances as to justify a belief in imminent danger of great bodily harm to person, or destruction or serious injury to habitation, may not be resisted with deadly weapons.

4. HARMLESS ERROR — *refusal to instruct concerning specific intent as element of higher crime charged, where accused convicted of lesser crime involving no such intent.* Where an information under section 38 of the Crimes and Punishments Act charges, as the statute requires, a specific intent to kill a particular person, but the conviction is had under section 42 of such act, for the lesser offense of wounding such person under such circumstances as would constitute manslaughter in the third degree if death had ensued, a refusal to instruct the jury that the State must prove such specific intent to kill such particular person, is harmless error.

*Error from Ellis District Court.*
*Hon. Lee Monroe, Judge.*

AFFIRMED.                         OPINION FILED MARCH 6, 1897.

*Bond & Osborn,* for plaintiff in error.

*John E. Hessin,* for defendant in error.

DOSTER, C. J.    Daniel Countryman, the appellant, lived at Wakeeney, Trego County.   His son had recently married, and together with his bride was at his father's house.   The evening of August first, after dark, the premises about the house were invaded by a party of riotous disturbers, intent upon giving the newly wedded pair a mock serenade, called a charivari.   This was especially annoying and objectionable to the appellant, who is a physically diseased and mentally nervous and excitable person.   He remonstrated with the party and warned them away; but failing to induce them to desist, or leave his premises, he fired a loaded gun at them, and shot and wounded one of the number, named Joseph Sigler. He was arrested and prosecuted under section 38 of the Crimes and Punishments Act, for shooting at and wounding Sigler with intent to kill him.   A change of venue was taken to Ellis County, where, upon a trial of the case, a verdict and a judgment of conviction were rendered against him, under section 42 of the act, for wounding Sigler under such circumstances as would have constituted manslaughter in the third degree if death had ensued.   From this he appeals.

His first objection in the court below was by plea in abatement of the prosecution, upon the ground that no preliminary examination had been accorded

him.   This was overruled ; and afterward, upon the
call of the case for trial, an objection was interposed
to the jurisdiction of the court, upon the ground that
the term then pending in Ellis County, that of the
fourth Monday in May, 1896, was not authorized by
law.   This was likewise overruled.   These, and other
claims of error, based upon instructions given and re-
fused and upon the insufficiency of the evidence to
support the verdict, are brought up for review.

Of all the witnesses, the evidence of the defendant
was the most favorable to himself ; and, to a correct
understanding of the case, so far as it involves the
instructions and the sufficiency of the facts proved,
a summary of his testimony is given, together with
literal quotations of its most material parts :

"Am 54 years of age, and served during the last
war ; and while in the military service contracted
chronic diarrhœa from which am still suffering.   Suf-
fer also from heart trouble, and have done so for about·
10 years.   The condition of my physical health has
prevented the doing of manual labor for five or six
years, and for the last three or four years have not
been permitted to go away from home alone.   The
effect of this heart trouble and chronic diarrhœa upon
my nervous system has been to render me nervous
and excitable.   Such has been the case for 8 or 10
years, and it has grown worse from day to day until
the present time.   July 31, I accompanied my family
to a point about 40 or 50 miles distant to attend the
wedding of my eldest son ; and on the following day
returned to my home in Wakeeney with my family,
including the newly married pair.   In the evening,
upon my return, I learned that a charivari was to
be given to the bridal party.   I sent for the city
marshal, who came to my house, and whom I asked
to prevent the anticipated disturbance.   The mar-
shal said he couldn't stop it, but said to allow the
boys to have their fun until about nine o'clock, and

52—57 KAN.

then he would come along and put an end to it. I agreed to that, but said that I would not have the charivari party inside my yard or allow them to molest anything. In about an hour and a half afterward, the expected rioters came, and invaded the yard premises, yelling, ringing bells, pounding on tin pans, and throwing missiles, seemingly stones, against the house; whereupon I took my loaded gun and went to the door, and undertook to talk to the disturbers of the peace, but could not make them hear for the noise. I then took the gun, pointed it to one side of them and up in the air, and fired it; whereupon they stopped their noise and scattered out onto a vacant lot adjoining. I went out to the gate and tried to remonstrate with them, but every time I would say anything they would interrupt with yells. I told them that, as long as they stayed outside there, they could make as much noise as they wanted to, as far as I was concerned, but they must stay outside, let the property alone, and not molest anything. If they came inside and went to molesting anything I would shoot, and shoot to hurt; whereupon I retired into the house where all the family were. I admit being excited at this time. In about 5 or 10 minutes they returned inside of the yard, and stuck their heads up against the windows, and yelled, and rang bells, and then went away, and were gone for a while; but in a very short time they returned and went to making still more noise than before, and, among other things, jammed, or forcibly threw, some thing against the house, which I think was my hitching-post, because next morning I found such post pulled up or broken off, and lying with one end against that part of the house from which the noise of jamming or bumping had proceeded. I again took the gun and went out of the door, and stepped around the corner of the house and saw a clump of men standing there.

"Q. Where were they? A. They were at the west. Very near the west end of the house.

"Q. State what you did. A. I ordered them out of the yard.

"Q. What did they do? A. Stood there and looked at me.

"Q. What did you do? A. I raised up my gun, kind of this fashion [indicating], and fired.

"Q. State if at the time you fired you knew any of the parties who were back there in the yard. A. I did not.

"Q. Did you shoot at Walter Olson? A. I did n't shoot at any particular man.

"Q. State to the Court and jury, what your intention was when you went out with that gun. A. To scare them out of the yard.

"Q. State whether after you had fired the gun you heard anybody make any exclamation. A. I did.

"Q. What was said? A. I heard a man say, ' My God! I am shot! I am shot in the leg!'

"Q. State after that where you went. A. Back into the house."

" I had a picket fence, with boards along the bottom. About 10 feet of such boards had been broken off by the rioters, and about 10 of the pickets pulled off or torn loose. The sidewalk close by the house was twisted around and torn up. At the southeast corner of the house there was a hole in its side, which I had never seen before. It had been freshly broken. The whole disturbance did not last over 20 minutes from the very beginning, and it was not more than two or three minutes from first hearing the noise until I went to the door with my gun. No one tried to get into the house at either windows or doors. No windows were broken, but one window was up, and some one — didn't know who — stuck his head in it. I recognized no one, so as to tell who they were.

" Q. There was n't anybody threatening any danger to you, was there? A. They had n't made any threats to me.

"Q. When you went out into the yard, now—afterwards when you came in, and then you went out into the yard—you took your gun with you? A. Yes, sir.

"Q. What did you take the gun with you that time for? A. To scare them out of the yard.

" Q. To scare them? A. Yes, sir

" Q. When you got around there you heard the boys still making a racket? A. Yes, sir.

" Q. They were pounding on these things when you walked to the corner of the house? A. Yes, sir.

" Q. You ordered them to leave? You are sure you ordered them to leave? A. I am.

" Q. Do you know whether they heard you or not? A. I couldn't say they heard; I couldn't tell; but they turned around and stood there looking at me. When I came out of there some of them started to run.

" Q. When you told them to leave? A. Yes, sir.

" Q. You didn't wait any longer, but fired the gun right into the crowd? A. Yes, sir.

" Q. If you went out to scare them that time, why didn't you shoot over their heads like you did before? A. Because I told them if I shot I would take no pains.

" Q. Then you didn't take any pains; you meant to do just what you did? A. I shot with the intention of scaring them out of the yard. I didn't take no pains to miss or hit.

" Q. Don't you think you would have scared them as bad to have shot over their heads? A. No, sir; because they had been tried.

" Q. You meant business, didn't you? A. I did.

" Q. Did you know when you got out there whether your fence had been molested? A. I didn't know whether the fence had.

" Q. Did you know the sidewalk had been molested? A. I did.

" Q. You knew it had, did you? A. I knew when I came out that it had been moved.

" Q. You saw that as you stepped out? A. Yes, sir.

" Q. Don't you think from what occurred there at the time when you fired that first shot, that if you had said to the boys to 'go away now' and not molest you, that they would have gone? A. No, sir.

" Q. They weren't trying to do anything further at

the time you scared them off ?   Could you tell whether they were men or boys?   A.  I could not.

" Q.  You could n't tell anything about that ?   Did you hear boys' voices?   A.  I did n't know whether it was boys' or men's.

" Q.  What was your belief with respect to the necessity of your firing at that time, as to the protection of the property and your family?   A.  I believed it was necessary.   I believed I had to do something to protect myself and property and family there, by the actions of the mob, or whatever you may call it, after I forbid them coming in.

" Q.  Now, this noise you had heard made against the house was made before you went out, was n't it? A.  Yes, sir.

" Q.  You picked up the gun and went out after you heard the noise?   A.  Yes, sir.

" Q.  They were making a racket out there?   A. Yes, sir.

" Q.  They were n't molesting the house at that time?   A.  Not after I got out.

" Q.  Now, then, when you said ' go,' as you said, there were a part of them skipping out?   A.  A part of them was skipping out when I went out there.

" Q.  Now, you say you said for them to go, and you turned right around and fired your gun into the crowd?   A.  They had time to go.

" Q.  You said, a bit ago, you done that?   A.  I did, but they had time to go.

" Q.  Was there anybody then trying to molest you at that time, or your house or your family?   A.  No, sir.

" Q.  Then, do you pretend to tell this jury that it was necessary, for the protection of yourself and your family and your house, to shoot one of those boys at that time?   A.  I did.   I can positively state to the jury that I did feel that way.

" Q.  And at the same time part of the boys were skipping out?   A.  Yes, sir."

The plea in abatement was properly overruled.

The complaint filed with the examining magistrate read as follows :

" *State of Kansas, Trego County, ss.*

"F. D. Street, being duly sworn, on oath says, that on the first day of August, A. D. 1895, in the County of Trego and State of Kansas, Daniel Countryman did then and there, unlawfully, feloniously, wilfully, deliberately, and of his malice aforethought, make an assault in and upon Joseph Sigler, with a certain shot-gun, breech-loader, which said shot-gun was loaded and charged with gunpowder and leaden shots, did discharge and shoot off, against and upon the said Joseph Sigler, on the left knee, with intent to murder the said Joseph Sigler.     F. D. STREET.

"Subscribed and sworn to before me, this 1st day of August, A. D. 1895.

JOSHUA GROFT, *Justice of the Peace.*"

This complaint was quoted in the warrant of arrest. The justice's docket, at the appropriate place and in the logical order of statement of proceedings before him, contained the following entry :

"August 2, 1895. Plaintiff by John A. Nelson County Attorney present.     Defendant appeared in person.     The defendant waived formal arraignment and plead not guilty.     And it appearing that the said offense was committed and that there is probable cause to believe the defendant guilty of its offense, it is by me adjudged that he do enter into a recognizance in the sum of one thousand dollars, for his appearance at the next term of the District Court of Trego County and for want of such recognizance that he be committed to the jail of Trego County there to remain until discharged by law."

The justice's *mittimus*, or order of commitment, recited in substance the complaint and warrant of arrest.     These papers and proceedings show a more

Opinion of the Court.

than usually strict and technical com-

1 Best evidence
   of preliminary
   examination. pliance with legal forms, and are with-
out doubt full and sufficient evidence of
a preliminary examination, or trial, and, in fact, are
the best evidence.

The objection to the jurisdiction of the court was
likewise unfounded. It was based upon the theory
that the term of court in Ellis County commencing on
the fourth Monday in May, 1896, at which the de-
fendant was tried, was not authorized by law. The
Laws of 1889, chapter 118, section 20 (¶ 2040, Gen.
Stat. 1889), fixed the terms of court in all the counties
in the twenty-third judicial district, and specifically
as to Ellis County on the second Monday in May, and
in Trego County on the fourth Monday in May, of
each year. In 1895, the times of holding court in all
the counties of the twenty-third judicial district, were
changed by an act purporting, in its title and in its
first section, to amend paragraph 2040 of the General
Statutes of 1889. (See Laws 1895, chapter 107.) By
this act the May term in Ellis County was fixed for the
fourth Monday, and what had been the May term in
Trego County was postponed to June ; but it contained
no specific clause repealing the act of 1889, and because
of this it was claimed to be violative of section 16,
article 2 of the Constitution, which declares that,
"no law shall be revived or amended unless the new
act shall contain the entire act revived, or the section
or sections amended, and the section or sections so
amended shall be repealed." The older law, however,
has been repealed by the necessary implication aris-
ing out of the adoption of an entirely new provision
covering every detail of the older one,— by providing
anew all which the older one provided for. The law
of 1895 not only changed the time of holding the

May term of court in Ellis County, but of the other terms as well, and not only changed all the terms in Ellis County, but all the terms in all the other counties of the twenty-third judicial district. Thus the new law did contain the "entire section amended," to use the language of the Constitution, or, the entire section *as* amended, which is what the Constitution means. Therefore, the law providing for terms of court in Trego County on the fourth Monday in May, and Ellis County on the second Monday in May, had been amended by another, which assigned the fourth Monday in such month to Ellis County, and another day in another month to Trego County ; and, similar changes having been made as to all the other counties in the twenty-third district, and as to all their terms, the later, was a substitute for the earlier one in all its parts, and as to its entire subject-matter. This accomplished a repeal of the earlier one by implication ; which is allowable without any express repeal. *State v. Guiney*, 55 Kan. 534.

2. Repeal of statute by implication sufficient repeal.

The defendant, at the close of the trial, preferred requests to the Court for certain instructions to the jury, to the effect that one whose person or family, or property is attacked by a party of rioters, may resist such attack, whether felonious or otherwise, by the use of such means as will make his resistance effectual, even to the extent of using fire-arms or other deadly weapons ; and to the refusal of the Court to give such instructions exceptions were preserved. These instructions were correctly refused. It is not the law that one may resist a non-felonious assault upon himself, or his family, or his property, by the use of deadly weapons. He may resist non-felonious assaults by the use of such weapons or means as may

be necessary to repel them, but not to the extent of taking or endangering life. *State v. Thompson*, 9 Iowa, 188 ; *State v. Kennedy*, 20 id. 569 ; *Rippy v. The State*, 2 Head, 217 ; *Gallagher v. The State*, 3 Minn. 270 ; *Harrison v. The State*, 24 Ala. 67. These and other like cases are to be found in Horrigan & Thompson on Self Defense.

The defendant's testimony, heretofore quoted, and which, as we have said, is the most favorable to himself of all the witnesses, shows no felonious assault ; in fact, no assault at all, upon his person, nor upon any member of his family. It shows nothing but a trespass — aggravated and inexcusable, however — upon his property. No threats of harm to himself or to his family had been made by any of the rioters. At and before the time of firing upon the intruders, some of them were standing still, apart from him and his house, while others were running away. Fear upon the defendant's part that the rioters would assault him or his family, or injure his property, did not justify the use upon them of a deadly weapon. The use of a deadly, weapon by a person in defense of himself, his family, or his property, is unjustifiable, except where the assault is felonious in character, is impending, and is so near to being made that its consummation can be prevented by the use of no other means adequate to repel it. This was the law laid down in *Commonwealth v. Selfridge*, by Judges PARSONS, SEDGWICK, SEWELL and PARKER, of Massachusetts, near an hundred years ago, and it has remained without serious challenge to this time. Horrigan & Thompson, Self Defense, 1.

The case of *Patten v. The People*, 18 Mich. 314, is confidently relied upon by the defendant to sustain his view. In that case, however, it was in evidence

that the defendant's mother was severely ailing, and
that the noise of the riotous party, and the terror into
which she was thrown by their presence and conduct,
greatly endangered her life, and the court, therefore,
correctly, as we think, instructed that the defendant
was justified in the use of a deadly weapon in the pro-
tection of his mother.   In that case, however, Judge
CHRISTIANCY, in delivering the opinion of the court,
distinguished between cases in which the defendant
might or might not be justifiable in the use of deadly
weapons, and, in so doing, paralleled, in the latter
instance, the case we have under consideration.   He
remarked as follows :

" Considering the case first, with reference only to
the facts existing prior to the time when the defend-
ant went out with the axe, and without reference to
the peculiar effects produced by the conduct of the
rioters upon his mother, there was nothing, I think,
in the evidence fairly tending to show a state of facts
which would justify or excuse the defendant in rush-
ing out and attacking any of the rioters with an axe,
or other dangerous weapon, for the purpose of com-
pelling them to desist or leave, though he might have
been excused for attempting to drive them off by
force, and even by blows with any instrument not
calculated to endanger life or limb.   But though,
from the sudden, violent and capricious impulses to
which an excited mob is always subject, danger may
always be naturally apprehended, especially about a
man's dwelling at night, whatever the original object
of the assemblage may have been — and no one can
estimate the nature or extent of the danger — yet, un-
til some actual violence has been done or attempted
in this case against either the house, or its inmates, the
necessity which alone could excuse taking the life of
any of the assailants, had not yet occurred, and might
never occur.   And though the defendant had the right
to act under the circumstances as they appeared to
him, yet up to this point (without reference to the

defendant's mother) there was nothing in the circumstances which fairly tended to show that he could have believed the dire necessity to have arisen.''

Of course, it is not to be understood that one may not act in defense of his person, family, or habitation upon appearances of danger, even though there be no real danger.　There must, however, be *appearances* of danger — appearances which impress themselves upon the mind of an ordinarily prudent, cautious, and self-possessed person as dangerous.　These were totally lacking in the case under consideration, even according to the defendant's own testimony.

The Court instructed the law to be that one who honestly believes that his person, family, or habitation is about to be injured by a riotous assemblage, has the right to disperse such assemblage by the use of such force as may honestly appear to be necessary for such purpose, even to the extent of using deadly weapons ; but that the degree of force employed must not exceed that which he honestly believes is necessary to accomplish the purpose, without exposing himself or family to danger of bodily harm.　This statement of the law was correct, and covered the facts of the case on trial.

Complaint is also made of the refusal of the Court to instruct the jury that the proof upon the part of the State must be of a specific intent in the defendant's mind to kill Joseph Sigler, and that proof of firing into a crowd of boys, with no specific intent to kill any one in particular, would be insufficient to convict of an assault with intent to kill.　If the law be as claimed by the defendant, the refusal of this instruction was harmless error ; because the defendant was not convicted under section 38 of the Crimes Act, which re-

4. Harmless error to refuse certain instructions.

quires proof of such particular intent, but was convicted under section 42 of such act, which does not require proof of such intent.

It has already been held that a charge under section 42, of assaulting and wounding under such circumstances as would constitute manslaughter if death had ensued, is included in an information for assault with intent to kill, under section 38. *State v. Burwell,* 34 Kan. 312.

Some criticism is made upon the language of one or two instructions which the Court gave, but no substantial questions of error are raised ; and, there being none in the record, the conviction is affirmed.

All the Justices concurring.