THE STATE OF KANSAS v. A. B. RYNO.

No. 13,501.   (74 Pac. 1114.)

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Assault with Deadly Weapon.* One charged in an information with shooting with intent to kill with a deadly weapon, under section 38 of the crimes act (Gen. Stat. 1901, § 2023), may upon sufficient proof be convicted under section 42 of the same act (Gen. Stat. 1901, § 2027), of wounding under circumstances that would have constituted manslaughter in the fourth degree if death had ensued.

2. EVIDENCE—*Proof of Handwriting.* Proof of the genuineness of a disputed writing may be made by a comparison with other writings of the same person, either admitted or clearly proved to be genuine.

3. ———— *Handwriting—Questions for Court and Jury Distinguished.* The sufficiency of the proof of a writing to be admitted as a standard of comparison is a question to be passed upon in the first instance by the court, but the weight and effect to be given the evidence by comparison, including the genuineness of the standards, is ultimately a question for the determination of the jury.

4. ———— *Testimony of Expert—Use of Blackboard.* An expert in handwriting may give not only an opinion, but the reasons for his opinion, in his examination in chief, and for the purpose of illustrating and explaining his testimony and conveying to the jury the reasons for his opinion he may be permitted to make illustrations upon a blackboard.

5. CRIMINAL PRACTICE—*General Instructions about Reasonable Doubt, etc.* Where there is a general instruction that each juror shall act upon his own judgment, and that each must be satisfied beyond a reasonable doubt that every element of the offense has been proved before there can be a conviction, it is not necessary to apply this rule of individual right and responsibility of jurors to each feature and element of the offense.

6. ———— *Instruction Concerning Failure of Defendant to Testify.* The defendant not having testified in his own behalf, the court instructed the jury that "while the statute of this state provides that a person charged with crime may testify in his own behalf he is under no obligation to do so, and the statute ex-

pressly declares that his neglect to testify shall not create any presumption against him." *Held*, that the giving of the instruction in this form was not prejudicial error.

7. ——— *Refusal to Instruct as to Assault.*   Under the evidence in this case, wherein it appears that if the defendant was guilty of any offense it was one of a higher grade than a mere assault, the refusal of the court to instruct the jury as to assault is not error.

8. DEADLY ASSAULT—*Evidence Sufficient.*   The evidence examined and held sufficient to sustain the conviction.

Appeal from McPherson district court; M. P. SIMPSON, judge.   Opinion filed January 9, 1904.   Affirmed.

*C. C. Coleman*, attorney-general, *D. P. Lindsay, Frank O. Johnson*, and *Grattan & Grattan*, for The State.
*John D. Milliken*, and *F. L. Martin*, for appellant.

The opinion of the court was delivered by

JOHNSTON, C. J.: On the night of July 5, 1902, while Maud Holmes was in her chamber preparing to retire, a gun was fired near the house, a charge of shot from which passed through a screen window near which she was standing, striking her head, neck, and breast, and inflicting serious wounds.   She was a young unmarried woman who lived on a farm with the other members of the Holmes family, consisting of her father, mother, and sister, all of whom were in the house when the shooting occurred.   No one was seen to fire the gun and who did it was, for some time at least, a puzzling problem.   Attention was finally directed toward A. B. Ryno, who resided in another neighborhood about three miles distant from the Holmes place.   He was about fifty years of age, married and having a family of five children, the youngest of whom was sixteen years of age.

It appears that in January, 1901, some one representing himself to be George R. Clark wrote to Maud

Holmes, proposing a correspondence with her. He claimed to be from Ohio and was in Kansas looking for investments, and dated his letter at Canton, Kan., a point in the county in which Maud Holmes lived. She consented to, and did, correspond with him for a time, keeping copies of the letters which she sent to him. Although his letters were posted from neighboring places and on railway-trains near Maud Holmes's home, he did not call on her until October 8, 1901, when he introduced himself as the George R. Clark who had been carrying on the correspondence. At the same time he also met Maud's father and mother, and as the visit lasted about three hours all had an opportunity to observe his appearance, manners, and peculiarities. He talked about the correspondence and the subjects about which they had been writing, and undertook to explain the reasons why his letters had been so strangely posted at different places. At that time Maud indicated that she did not desire to carry on the correspondence further, but he continued to write to her and to other members of the Holmes family until shortly before the shooting. The letters first suggested love, a desire for matrimony, an effort to have Maud meet him at different places, and to take a trip to Ohio. There were some sensual allusions, which suggested resentment because she did not conform to his wishes; jealousy of a young man with whom she was keeping company; a possible or impending tragedy in the family, and references to the poisoning of the Holmes dog; an attack on, and fright of, Maud a short time before she was shot; and other occurrences about the Holmes home about which only a participant could well have knowledge. Ryno was recognized by Maud and the other members of her family as the George R. Clark who had

called at the Holmes place and then acknowledged the writing of the letters sent prior to the visit. These, with other circumstances, pointed to him as the guilty one and a prosecution was instituted against him. He was charged with an assault upon Maud Holmes with an intent to kill her, under section 38 of the crimes act (Gen. Stat. 1901, § 2023), and upon the trial the jury found him guilty, under section 42 of the same act (Gen. Stat. 1901, § 2027), of wounding Maud Holmes under circumstances which would have constituted manslaughter in the fourth degree if death had ensued.

On appeal he complains, first, that the court submitted the case on the theory that the offense defined in section 42 of the crimes act was included in the offense charged under section 38, and he contends that the offense

1. Assault with deadly weapon— conviction upheld.

of which he was found guilty is not included in the one charged in the information, and that the verdict rendered was equivalent to an acquittal of the charge. In effect, the same question was raised in *The State v. Burwell*, 34 Kan. 312, 8 Pac. 470, and decided contrary to the contention of the appellant. In that case the charge was under the same section, of shooting with intent to kill with a deadly weapon, and the verdict was the same as the one returned in the present case, of wounding under circumstances that would have constituted manslaughter in the fourth degree if death had ensued. We see no reason to change the rule which has been so long followed and which no doubt guided the court in the submission of the case. See, also, *The State v. Fisher*, 8 Kan. 208 ; *The State v. Terreso*, 56 id. 126, 42 Pac. 354 ; *The State v. Smith*, 57 id. 673, 47 Pac. 541 ; *The State v. Countryman*, 57 id. 815, 48 Pac. 137.

Error is assigned on the admission of the testimony of J. F. Shearman, or rather on the manner in which he gave his testimony. It is said that he is a member of the bar and a clerk in the federal court, with a state reputation as an official and citizen of exceptional natural ability and unusual accomplishments; that he is of fine personal appearance and has had an experience of fifteen years in studying and testifying as 2. Proof of handwriting. an expert in handwriting, and that he gave his testimony with illustrations on a blackboard in an argumentative and very impressive way. The testimony does show that he had given the subject of handwriting much study and that his qualifications as an expert had been recognized in many of the state and federal courts where he had been called to give testimony. His apparent intelligence, study and experience leave no doubt of his qualifications, and in fact the.appellant does not much question his competency, but does complain of the use of the blackboard with which he illustrated his testimony.

For the purpose of illustrating and explaining his testimony, an expert as to handwriting may make use 4. Use of black-board by expert. of a blackboard. In this way he can convey to the jury the reasons for his opinion and make the points of similarity or difference upon which his opinion rests more intelligible to the jury. (*McKay et al. v. Lasher et al.*, 121 N. Y. 477, 24 N. E. 711 ; *Dryer v. Brown*, 52 Hun, 321, 5 N. Y. Supp. 486 ; 15 A. & E. Encycl. of L., 2d ed., 281.)

There were submitted to this witness a large number of letters and other writings, and he made a comparison between them and other writings admitted or proved to be genuine. His testimony was therefore necessarily quite extended. It was competent to in-

quire of him on the direct examination the reasons for his opinion, and the blackboard illustrations served this purpose efficiently.   His opinion, unexplained, might have had little value, but when the reasons upon which it was based were given, the jury could then determine the soundness of his reasons and the correctness of his conclusions.   In *Steam Mill Co. v. Water Power Co.*, 78 Me. 274, 4 Atl. 555, it was expressly decided that the expert may give not only his opinion but the reasons for his opinion in his examination in chief, and of course the defendant is always at liberty to make a more detailed examination as to the basis of the expert's opinion upon cross-examination.   The objection that the testimony was not drawn out in the usual manner by question and answer is not sustained.   We see nothing unusual in the method of the interrogation, and while some of his answers were lengthy, they were responsive to the questions asked, and the subject-matter necessarily required extended answers. We find nothing in the conduct of this inquiry that trenches upon the rights of the defendant or furnishes ground for serious complaint.

Complaint is also made of the use of certain writings not acknowledged to be in the handwriting of defendant, as standards of comparison.   Some of these were admitted to be genuine, but a larger number were only shown by the testimony of the state to be the handwriting of the defendant.   Among the papers so used were the recognizances in the case, as well as school orders, agreements and leases which witnesses saw the defendant sign.   There were other writings upon which defendant had acted, or which he acknowledged to witnesses to be his own, or which were shown by testimony to be his.   There was practically no dispute in the testimony as to the genuineness of these

writings, although as to most of them there was no acknowledgment at the trial that they were genuine. Most of the witnesses who identified the papers and proved them to be the defendant's writing were not cross-examined, and no testimony contradicting the proof so made was offered by defendant. Under the rule which has been applied in this state, an acknowledgment is not essential to establish the genuineness and warrant the use of a standard of comparison. The courts of the country are not in accord on this question, but, "It is the established law of this state, and of many other states of this country, to permit proof of the genuineness of a disputed signature by comparison with other signatures, on other instruments in writing, admitted or proved to be genuine." (*Holmberg v. Johnson,* 45 Kan. 199, 25 Pac. 576.)

The recent case of *The State v. Stegman,* 62 Kan. 476, 63 Pac. 746, was a prosecution for the forgery of a bond purporting to be the act of another, and involved the point whether the standards of comparison used by experts called as witnesses must be admitted to be genuine, or can be proven to have been written by the party. It was there held, that "a writing clearly proved to be genuine, and about which there is no dispute in the evidence, may be used as a basis for comparison of handwritings and to show that a certain other writing with which it is compared is not genuine." (See, also, *Macomber v. Scott,* 10 Kan. 335; *Joseph v. National Bank,* 17 id. 256; *The State v. Zimmerman,* 47 id. 242, 27 Pac. 999; *Gaunt v. Harkness,* 53 id. 405, 36 Pac. 739, 42 Am. St. Rep. 297.)

There is some complaint that the court did not submit to the jury, as a question of fact, whether these standards of comparison were written by the defendant. Whether the writings offered as standards have

The State v. Ryno.

been sufficiently proved to be genuine to be used as standards must be determined by the court in the first place ; but the weight and effect of the evidence by comparison, including the genuine-ness of the standards, is ultimately a question for the determination of the jury.    Here no special instructions with respect to the standards were asked, and none was given, but the court submitted this, with all other testimony, to the jury, with the admonition that they were the sole and exclusive judges of all the facts in the case, and should give the weight to the testimony and opinions as to hand-writing to which they should deem them entitled. There was no intimation in the rulings or instruc-tions of the court that the genuineness of the stand-ards of comparison used by the experts was not submitted as a question of fact for the jury with the other testimony offered in proof of handwriting.

3 Question of fact for the jury.

Error is assigned on the refusal of the court to in-struct the jury that defendant was not on trial for the writing of letters to Maud Holmes, and that the let-ters could not be considered for any purpose except as they might throw light on the motive of the de-fendant.    This instruction was properly refused.    In the first place, it was unnecessary for the court to name any offenses or charges for which the defendant was not on trial.    The court did clearly define the offense with which the defendant was charged and for which he was on trial, and did direct the applica-tion of the testimony to that charge.    In the second place, the letters were receivable for other purposes than the mere motive of the defendant.    They tended to establish the identity of the author of the letters, as well as the connection of the defendant with the

offense charged, and, hence, to limit that proof to mere motive would have been error.

Exception was taken to the refusal of the court to give the following instruction :

5. Instruction as to reasonable doubt, etc.

"If the jury, or any one of the jury, after having considered all the evidence in this case, and after having consulted with his fellow jurymen, should entertain a reasonable doubt of defendant's guilt, or after such consideration and consultation should entertain a reasonable doubt as to whether or not the defendant was present at the time and place of the commission of the alleged shooting, then the jury cannot find the defendant guilty."

While this request was not allowed, the court did not overlook the individual duties and responsibilities of the jurors. In one of the instructions given they were told that "the burden is upon the state to prove by competent evidence every essential element of the crime charged, to the satisfaction of each and every juror, beyond a reasonable doubt." This was a sufficient admonition that each juror might act upon his own judgment, and each should be satisfied beyond a reasonable doubt that every element of the offense had been proved, and unless it was so proved there could be no conviction.

It is argued that this rule of individual responsibility should have been applied to the matter of alibi. It is not necessary, nor would it be proper, for the court to make special application of the rule of individual right and duty of each juror to every branch and feature of the case. When the rule has been stated to the jury, and applied generally to every phase of the case and every ingredient of the offense, the purpose of the law has been subserved. There was no request for a special and distinct declaration

The State v. Ryno.

on the law of alibi, nor any allusion to the subject, except the incidental reference to it in the requested instruction as to the individual duties and responsibilities of jurors.  If the defendant desired a distinct instruction as to that defense, it should have been requested, and the failure, therefore, to give a special declaration is not a ground for reversal.

Complaint is also made of a portion of the charge given, which stated that "while the statute of this state provides that a person charged with crime may testify in his own behalf, he is under no obligation to do so, and the statute expressly declares that his neglect to testify shall not create any presumption against him."  This was evidently given for the benefit of the defendant, who failed to testify in his own behalf. The complaint is that the court did not call attention to the further provision of the statute, that the prosecuting attorney cannot refer to the circumstance that defendant did not testify, and that it should not be considered by the court or jury before whom the trial takes place.  We think the instruction as given was beneficial to the defendant, and we cannot conceive that the omission of the other provision of the statute could have prejudiced the defendant.

*6. Failure of defendant to testify.*

There is criticism of the instruction as to circumstantial evidence, but we think it a fair statement of law as applied to the facts in this case, and that nothing in it could have misled the jury.

No error was committed by the court in declining to give an instruction on assault.  The act was committed with a deadly weapon, and, under the testimony, if the defendant was guilty of any offense, it was one of a higher grade than mere assault.

*7. Instruction as to simple assault.*

In connection with defendant's letters to Maud Holmes, her letters to him were read to the jury. Objections were made to the admission of these, and, although the ruling was not duly assigned as error, we are now asked to consider it. Her letters were made in duplicate, one of which she sent to him and the other she retained. His letters were responsive to those written by her, and hers explained those written by him. Her letters were in a sense adopted by him and made a part of his own, and together they constituted a single and continuous correspondence. If error had been regularly assigned on the reception of these letters, we would not regard it as ground for reversal.

The sufficiency of the testimony is challenged, and although it is largely circumstantial, we think it strongly tends to prove the guilt of the defendant. The letters, against which so many objections are made, constitute a great part of the incriminating evidence. That the defendant was the author of the letters was quite satisfactorily shown, and, although he assumed several characters, and wrote under several names, all the letters fit together and disclose a base purpose to gain the confidence of the young woman and procure her to meet him in a remote place, go through the form of a marriage, and thus establish a relation necessarily illicit. The improbability of a man so advanced in years and having a large family engaging in such a scheme and carrying it out at such risk and with so much trouble is urged against the verdict; but, however strange and unnatural such conduct is, the proof is so convincing that we have no inclination to disturb a finding based thereon. The letters show remarkable cunning in playing the different parts which

8. Evidence sufficient to support conviction.

he assumed, and also great persistency in the efforts to accomplish his purpose : but there are so many of them — thirty-nine in number — and they are so extended, that it is impracticable to set them out or even to summarize them here.

In connection with the letters themselves are the admissions made by him at the time of his visit, that he was the George R. Clark who had written the preceding letters, and he was fully identified as the defendant; the vindictive feeling exhibited toward a young man who was paying special attention to Maud, including an attempt to blacken his reputation and discredit him with the Holmes family; his ill will toward Maud herself, and intimations of a coming tragedy when his plans were thwarted; his prowling about the house where Maud lived, in the night-time, and his attempted assault upon her which was interrupted; the poisoning of the dog, so that he might go to the Holmes place without interference; the tracks such as his shoes would make, which were traced from the Holmes place to his farm; the wadding of the gun found after the shooting which corresponded with some used by the defendant; and the indications, too, that the shot was fired from such a gun as he had.   These facts and circumstances, together with matters not enumerated, furnish sufficient support for the verdict.

All the objections made have not been mentioned, but all have been examined, and we find nothing in them disclosing prejudicial error.

The judgment will therefore be affirmed.

All the Justices concurring.