OMOHUNDRO *et al. v.* STATE.

(*Nashville*, December Term, 1936.)

Opinion filed March 27, 1937.*

---

*Designated for publication Nov. 17, 1937.

W. M. FUQUA, W. D. DODSON, and CHARLES EMBRY, all of Nashville, for plaintiffs in error.

W. F. BARRY, JR., Assistant Attorney-General, for the State.

MR. JUSTICE DEHAVEN delivered the opinion of the Court.

Plaintiffs in error, John M. Omohundro, Seth P. Gibson, Jr., and James Ballard, hereinafter referred to as defendants, were convicted upon an indictment charging them with a conspiracy to violate sections 1996-2026 of the Code, relating to the registration of voters, and their punishment fixed at a fine of $750 each by the jury, and each given a workhouse sentence of 11 months

and 29 days by the court. From a judgment in accordance with the verdict of the jury and the imprisonment fixed by the court, defendants have appealed to this court and assigned errors.

Under section 11064 of the Code, the crime of conspiracy may be committed by two or more persons conspiring to commit any indictable offense. Under section 11065 of the Code, persons so conspiring are guilty of a misdemeanor. The indictable offense charged in the indictment is found in section 2022 of the Code which is, in part, as follows:

"It shall be a misdemeanor for any person to register or have his name registered as a qualified voter under this article, when he is not such a qualified voter; or to vote, or attempt to vote, on any certificate of registration issued under the provisions of this article to some one other or otherwise than the person voting, or offering to vote, on the same; or to procure or induce any other person to register or be registered as a voter not being legally qualified as such; or to induce or procure any other person to vote, or attempt to vote, on any certificate issued under the provisions of this article to another or otherwise than to the person voting, or offering to vote, on the same; or to alter, change, forge, or counterfeit, or procure the same to be done by another, the certificates of registration provided for in this article; or to issue, circulate, or in any way use, or attempt to use, any fraudulent certificate of registration, the same not having been regularly issued by duly appointed and legally qualified registrars, as provided for in this article. And any person convicted of either of said offenses shall be fined not less than fifty dollars,

or be confined in the county jail or workhouse not less than thirty days, or both, in the discretion of the court.''

The indictment charged, in substance, that defendants entered into a conspiracy to forge, counterfeit, and issue the voting certificates of registration of numerous persons, fictitious and real, as of the dates of the regular biennial registration held by the Davidson county election commission on August 12-16, inclusive, and said certificates of registration, in accordance with said conspiracy, were to be recorded, and said persons, fictitious and real, were to be enrolled on the registration books of the Third civil district, Davidson county, Tenn., as qualified voters of said district.

Section 11066 of the Code is as follows:

''No agreement shall be deemed a conspiracy unless some act be done to effect the object thereof, except an agreement to commit a felony on the person of another, or to commit the crimes of arson or burglary.''

It was charged in the indictment that the defendant Omohundro, as an overt act in furtherance of the unlawful conspiracy, surreptitiously obtained the regular registration certificate book of said district, containing blank certificates, with stubs attached thereto, and wrote on said stubs the names of hundreds of persons, fictitious and real, numbering the stubs and giving the name, age, color, sex, occupation, and address of such persons.

It was further charged that defendants Gibson and Ballard, as an overt act in furtherance of said conspiracy, each surreptitiously obtained the registration books, or scrolls of said district, and each enrolled in the books so obtained by them the names of hundreds of persons, fictitious and real. It was further charged that, as a

joint overt act in furtherance of said conspiracy, all of the defendants enrolled said persons in the registration certificate stub book and registration books, using corresponding numbers, ages, color, sex, occupation, and addresses.

The proof shows that the registrars for the Third civil district for the biennial registration held August 12-16, 1935, were M. E. Benson, Sr., and Mrs. W. R. Johnson, the 28-year-old daughter of defendant Omohundro, who lived with her husband in certain rooms of her father's home. At the close of each day's registration, except the first two days, Mrs. Johnson took charge of the books. Where she deposited or kept them overnight is not shown in the proof. Mrs. Johnson did not testify in the case. The State and the defendants stipulated that the failure to introduce her as a witness should not prejudice the case as to any of the parties. It is the theory of the State that defendant Omohundro gained access to these books at night while they were in his home. This is denied by Omohundro. There is no proof that defendants Gibson and Ballard were in Omohundro's house on these or any other nights. Both deny they were there, and both deny meeting Omohundro at any other place during the period in question.

It is not questioned by defendants that fraudulent entries were made in the registration books and the certificate stub book showing the enrollment of hundreds of voters. Defendants deny, however, any connection with these fraudulent entries.

Defendant Omohundro, 52 years of age, has been a justice of the peace from the Third civil district since 1924. He was constable of that district for about eighteen years and served as *capias* officer in the criminal

court of Davidson county for several years. During the World War he was chief of detectives of the United States goverment at the Old Hickory Powder Plant. He also served as acting city judge for the city of Nashville for about two and one-half years. He proved on the trial a good reputation.

Defendant Seth P. Gibson, Jr., 48 years of age, is a resident of the Third civil district, where he lives with his wife and two small boys. His occupation during the time here in question is not clearly shown. He has known defendant Omohundro for about thirty years and they are close friends. He has known the defendant Ballard about two or three years, but only to speak to him, and has seen him very little. It was shown by the State's witness, M. E. Benson, Sr., who had been acquainted with Gibson for ten or fifteen years, and who had been serving as registrar in that district for twelve or fifteen years, that he had never seen Gibson take an active part in or have anything to do with the registration of voters, other than to register. Gibson denied having any interest in any election. He introduced certain character witnesses, and proved a good reputation. It does not appear that he was ever before accused of any criminal act.

Gibson testified that on Friday night, August 16, 1935, he was at home with a sick child; that he worked on Saturday and that night talked to a guest from New Orleans, and later in the night left for a fishing trip to Arrow Lake, and returned Sunday night. He exhibited a fishing permit dated August 18, 1935, and a copy from the records of the telephone company, at Nashville, showing a call at 6:35 p. m. Saturday to Mt. Pleasant, near which place Arrow Lake is located. This call, he

says, was to make arrangements for a boat. The witness Stribbling testified that in the summertime he went fishing with Gibson almost every Sunday, but had no independent recollection of this particular date. Gibson says Stribbling accompanied him on this occasion.

Defendant James Ballard, twenty-nine years of age, is a negro. He is a school teacher, being principal of the Old Hickory School. He is a graduate of A. & I. State College, and attended Walder College and Fisk University. He has lived in the city of Nashville between eight and ten years, and prior thereto lived in the Third civil district, where he has relatives. He says he knew Omohundro by sight for several years, and also Gibson, but got acquainted with them at the trial of this case. He denies having taken any part in the registration in question, and no one saw him in or about the places of registration. He is not shown to have had any interest in any election or candidate for office. He was never before accused of any crime, and proved, on the trial, a good reputation.

The State showed that the registrar, M. E. Benson, Sr., was aided at times in the work of registration by his son and his son's wife. Also, that at times he would get one of the clerks in the store where the registration was being held to assist. On one occasion, Benson, Jr., says defendant Omohundro, wrote three or four of the names in the books. Confessedly, the books contain the writing of a number of different people. The registration seems to have been loosely conducted. The statute (Code, sec. 2016) requires that at the close of each day's registration, the registrars shall draw a heavy black line, in ink, immediately under the last name registered on that day, entirely across the page. This was not done,

and this omission made possible to a large extent the fraudulent addition of other names.

The fraudulent registrations appear in three main groups. The first group, under dates August 14 and 15, from number 296 to 415, inclusive, with the exception of four valid registrations, being numbers 400-403; the second group from number 659 to 835, inclusive, under dates August 15 and 16; the third group from number 982 to 1421, entered after the final closing of the registration.

Benson, Sr., and his son and daughter-in-law disclaimed having written any of the fraudulent registrations, and stated they did not know in whose handwriting the same appear.

It was shown by the State's witness, D. P. Caldwell, a justice of the peace of the said district, that he visited the place of registration about 6:15 p. m. on August 16, and at that time the books showed 905 persons registered; that on either the Saturday or Monday following, Omohundro called him on the telephone, or came to his office, and asked if he could guess how many had registered. Caldwell announced 905. Omohundro then said there were over 1,500 registered, and that "we were at a hell of an expense in registering them." No explanation of how the expense was incurred was made, but Caldwell considered expense in such case to be the cost of hauling people to the place of registration. This evidence was admitted as applicable to Omohundro only.

On Monday morning, the registration books were taken to Omohundro's office, by Mrs. Johnson, and he carried them over to the office of the election commission; the books being heavy. Mrs. Johnson accompanied him,

and the books were turned over, having been certified by her and her coregistrar to be correct.

The State, in its investigation to determine in whose handwriting the fraudulent registrations were entered on the books, took certain *mittimuses* and releases found in the files of the county jail, and undertook to prove by certain officers that these papers were, both in body and signature, the genuine handwriting of defendant Omohundro. The signatures were admitted by Omohundro to be genuine, but he denied that any of the other handwriting on these papers was his.

It was stipulated by counsel for the State and defendants Gibson and Ballard (1) that the signature of Gibson to an application for a telephone, to two receipts, to an application for a loan, to a bank signature card, and to three bank deposit slips, was, in each instance, genuine. These papers are exhibits G-1 to G-8. However, the figures on the deposit slips were not stipulated to be in the handwriting of Gibson. (2) That the signature of defendant Ballard to four papers was genuine, as well as his street address on two of them and the word "teacher" on one of them.

Section 9731 of the Code is as follows:

"In all the courts comparison of disputed writing or signatures with any writing or signature *proved to the satisfaction of the judge to be genuine,* shall be permitted to be made by expert witnesses, and such writing or signatures, and the evidence of expert witnesses respecting the same, shall be submitted to the court, or courts, and jury as evidence of the genuineness, or otherwise, of the writing or signature in dispute." (Italics ours.)

For the purpose of establishing a standard of comparison, the trial judge, in the absence of the jury, heard

testimony with respect to Exhibits O-1 to O-15, being the *mittimuses* and releases found in the files of the county jail, and held as a *preliminary* proposition that these exhibits were in their entirety in the handwriting of defendant Omohundro. He said: ''I am holding this testimony will go to the jury. I am passing on it as a preliminary proposition that it is the genuine handwriting of Mr. Omohundro.'' The witnesses testifying before the judge were introduced before the jury, with some exceptions, and the whole matter of the handwriting on said exhibits, whether it was that of Omohundro or not, was again thrashed out. In his charge to the jury, the trial judge said, in part:

''With reference to these same Exhibits O-1 to O-15 offered by the State as containing the genuine handwriting of the defendant Omohundro, this defendant denies the making of such handwriting other than the signatures thereon. Such being the case, before you may consider the writing other than the signatures in these exhibits for any purpose, you must be satisfied beyond a reasonable doubt that such handwriting other than the signatures is the genuine handwriting of the defendant Omohundro.''

With respect to the figures on the three bank deposit slips, not admitted by Gibson, the witness Reynolds testified before the trial judge, in the absence of the jury, that in his opinion these figures were put on the slips by Gibson. Reynolds for a number of years had been head bookkeeper at the bank where these deposits were made. He does not claim to have ever seen Gibson write anything, and expresses nothing more than an opinion that the writing was that of Gibson. Upon the giving of this testimony, the trial judge *made no decision,* pre-

liminary or otherwise, that the writing, other than the signatures, was in the handwriting of Gibson. The witness Reynolds was heard by the court at a time subsequent to the hearing of the witness as to the handwriting of Omohundro. After testifying before the judge, the jury was called in, and Reynolds repeated what he had said before the judge. The question of whether or not Gibson wrote the figures on the deposit slips was left to the jury under a charge substantially the same as that above quoted with respect to the writing on Exhibits O-1 to O-15.

Chapter 22, Acts 1889, was carried into the Code as section 9731, above set out. In *Powers* v. *McKenzie,* 90 Tenn., 167, 177, 16 S. W., 559, 561, the court said, among other things:

"*Second,* it is insisted that the act provides that the judge shall, as a preliminary question decide upon the genuiness of the writings offered as a standard of comparison, and that this is an invasion of the province of the jury under the constitution."

In disposing of this question, the court said:

"As to the second ground of assault upon the act, it is sufficient to say that, in making it the duty of the judge, as a preliminary question, to pass upon the genuineness of the writings to be used as a standard of comparison, it is a legislative adaptation to the subject-matter of the settled rule of the common law, that, as a general proposition, it is the province of the court to say what is evidence in cases, and the province of the jury to decide upon its efficacy."

Chapter 22, Acts 1889, is almost in the exact language of the New York Act of 1880. In *Hall* v. *Van Vranken,* 28 Hun (N. Y.), 403, 64 How. Prac., 407, the court said:

"The statute of 1880, chapter 36, permits the comparison of a disputed writing with any writing proved to the satisfaction of the court to be genuine. This proof of genuineness, therefore, is addressed to the court, in distinction from the jury. The evidence on this point is not direct evidence upon the merits. It is somewhat analogous to evidence tending to prove the competency of one who is called as an expert and the like."

This court in *Franklin* v. *Franklin,* 90 Tenn., 44, 50, 16 S. W., 557, 558, said: "Comparison of handwriting by experts was at common law inadmissible." Referring to the Act of 1889, the court said: "This act opens the door to the admission of a class of evidence of very slight value. It is in derogation of common law, and should be strictly construed." The plain intent and purpose of the act is to permit an expert witness to make comparison between a writing or signature "proved to the satisfaction of the judge to be genuine" and writings in dispute. Unless and until the judge finds as genuine the writing offered as a standard of comparison, there can be no comparison by an expert.

We think the learned trial judge was in error in leaving to the jury the decision of whether or not the Exhibits O-1 to O-15 were in the handwriting of Omohundro. It is true that the judge found as a preliminary proposition that these papers were in the handwriting of Omohundro, but his decision was that this question would have to be passed on by the jury. With respect to the figures on the bank deposit slips bearing the signature of Gibson, the trial judge made no finding at all with respect to the genuineness of the figures.

The mass of testimony introduced before the jury on the question of whether or not the exhibits men-

tioned were in the handwriting of Omohundro, and the testimony of Reynolds as to the genuineness of the figures on the bank slips, was not direct evidence on the merits of the case, and could have but served to bewilder and confuse the jury, and was unauthorized and inadmissible under section 9731 to go to the jury.

The State introduced the witness Walter as an expert on handwriting. He testified at great length and by comparisons he made between the signatures and handwriting on the Exhibits O-1 to O-15 and G-1 to G-8, and the signatures of Ballard, with certain selected writings in the registration books and the certificate stub book, gave it as his opinion that the fraudulent entries in the registration books were in the handwriting of Gibson and Ballard, and that on the stub book was in the handwriting of Omohundro.

With respect to the numbers on the bank deposit slips of Gibson, the only proof that these were in the genuine handwriting of Gibson *was the opinion evidence of Reynolds.* Upon this opinion of Reynolds, Walter gave it as his opinion, on comparing those numbers with numbers in the registration books, that Gibson wrote some of the numbers in the books. Thus opinion evidence was superimposed on opinion evidence without any ruling by the judge that the figures on the slips were in the genuine handwriting of Gibson. We think this was error.

It is contended that the trial court erred in overruling defendants' demurrer to the indictment. We find no merit in this contention, and it is overruled.

It is complained that the trial judge erred in refusing to recuse himself, on motion of defendant Omohundro, on the ground of prejudice. The judge under

his official oath denied the allegations contained in defendant's affidavits, and held himself competent to try the case. We find no merit in this complaint. *In re Cameron,* 126 Tenn., 614, 151 S. W., 64.

It is further complained that the trial judge erred in hearing and determining the motion to recuse in the absence of defendant Omohundro, and that defendant was denied his constitutional right by the hearing and disposition of his motion in his absence.

In *Cisco* v. *State,* 160 Tenn., 681, 684, 28 S. W. (2d), 338, 339, the court said:

"And, again, in *Logan* v. *State,* 131 Tenn., 75, 173 S. W., 443, this Court cited with approval *Ward* v. *Territory,* 8 Okl., 12, 56 P. 704, to the effect 'that presence at the "trial" only means that the defendant shall be present in court from the beginning of the empaneling of the jury until the reception of the verdict and the discharge of the jury.'"

In the instant case, the motion of the defendant Omohundro, for the trial judge to recuse himself, was merely presented on affidavits, as is customary, and was only a matter preliminary to the trial of the case, and occurred before the impaneling of the jury. This assignment of error must be overruled.

Other questions are made in the case which we do not find it necessary to pass upon. For the errors above pointed out, we are constrained to reverse the judgment of the trial court and remand the case for a new trial.

### On Petition to Rehear.

The contention made by the State in its petition to rehear may be classified as follows: (1) That the de-

termination of the genuineness of the handwriting offered as a standard of comparison was for the jury; and (2) that even if the trial judge was in error in permitting the jury to determine the genuineness of the standards of comparison, no prejudice thereby resulted to defendants.

The first of these contentions is untenable in view of the plain language of the statute providing that comparison of disputed writing with *"any writing or signature proved to the satisfaction of the judge to be genuine, shall be permitted to be made by expert witnesses."* Code 1932, Section 9731. (Italics ours.) It is perfectly evident from the language used that the judge alone determines the question of the genuineness of the writing offered. It would be an unwarranted invasion of the jurisdiction of the Legislature for this court to undertake to strike out the word "judge" from the statute and substitute the word "jury."

In the case of *Powers v. McKenzie,* 90 Tenn., 167, 16 S. W., 559, 561, chapter 22, Acts 1889, was assailed on the ground that it left to the judge, and not to the jury, the decision as to the genuineness of writings offered as a standard of comparison. It was insisted that this was an invasion of the province of the jury under the Constitution. The court sustained the constitutionality of the statute, and held it was competent for the Legislature to leave to the judge the decision of the question. This decision of the eminent judges constituting the court at that time, among whom were HORACE H. LURTON, BENJAMIN J. LEA, and DAVID L. SNODGRASS, has stood unchallenged until now.

In speaking of the statute making it the duty of the judge to pass upon the genuineness of the writing, the

court said in *Powers* v. *McKenzie,* as quoted above in the original opinion in this cause: ''It is a legislative adaptation to the subject-matter of the settled rule of the common law, that, as a general proposition, it is the province of the court to say what is evidence in cases, and the province of the jury to decide upon its efficacy.''

Apt illustrations of the principle referred to by the court in *Powers* v. *McKenzie* are to be found in our criminal cases. In this state the admissibility of dying declarations is a question for the court alone, without the aid of the jury. *Dickason* v. *State,* 139 Tenn., 601, 202 S. W., 922. In cases of search and seizure it is always the duty of the judge, when objection is made because of an unlawful search, to determine, in the absence of the jury, as a matter of law whether such evidence is competent. *Goodwin* v. *State,* 148 Tenn., 682, 687, 257 S. W., 79. With reference to confessions, this court said in *Self* v. *State,* 65 Tenn. (6 Baxt.), 244, 253:

''When confessions are offered as evidence, their competency becomes a preliminary question, to be determined by the court. This imposes upon the presiding judge the duty of deciding the fact whether the party making the confession was influenced by hope or fear. *This rule is so well established, that if the judge allow the jury to determine the preliminary fact, it is error, for which the judgment will be reversed. Boyd* v. *State,* 21 Tenn. (2 Humph.), 39. These are elementary principles too long established and followed to be now questioned.'' (Italics ours.)

That the learned trial judge allowed the jury to determine the question of the genuineness of the writing on the exhibits is an undisputed fact. He charged the jury:

". . . Before you may consider the writing other than the signatures in these exhibits for any purpose, you must be satisfied beyond a reasonable doubt that such handwriting other than the signatures is the genuine handwriting of the defendant Omohundro."

The same charge was repeated with reference to the exhibits purporting to show the handwriting of Gibson. In support of its contention that the writings, offered as a standard of comparison, were in the handwriting of these defendants, the State introduced numerous witnesses, and their testimony was allowed to go to the jury over the objections of defendants.

The genuineness of the writing on the exhibits was disputed by Omohundro and Gibson. The collateral issue thus raised was left to the jury for determination. The court in the leading case of *University of Illinois* v. *Spalding*, 71 N. H., 163, 51 A., 731, 734, 62 L. R. A., 817, 826, 827, speaking on this point, said:

"If disputed signatures were admissible for the purpose of comparison, a collateral inquiry would be raised as to each standard; and the proof upon this inquiry would be comparison again, which would only lead to an endless series of issues, each more unsatisfactory than the first, and the case would thus be filled with issues aside from the real question before the jury. Juries are indeed more intelligent than when the common law denied them even the right to make comparison with admitted signatures not otherwise in the case, but the time has not yet come when they should be left without chart and compass. It is due to them and to the administration of justice that when called upon to pass upon the identity of a signature the standards furnished for this purpose should be genuine standards.

The jury should not be required, nor should they be permitted, to make comparison with disputed standards, and to settle for themselves the collateral question of the genuineness of the standards, which might often be more difficult than the main question of the genuineness of the writing in issue. Such a practice is not only indefensible in reason, but it is against the judicial and legislative opinion of the world, almost without exception. 15 Am. & Eng. Enc. Law (2 Ed.), pp. 272, 273; Lawson, Exp. Ev., 408; Rogers, Exp. Test., section 138.''

The English common-law procedure act of 1854, with respect to proving standards of comparison, is identically the same as our statute; both provide that such writing shall be ''proved to the satisfaction of the judge to be genuine.'' The New York act substituted the word ''court'' for the word ''judge.'' The case of *People* v. *Molineux*, 168 N. Y., 264, 61 N. E., 286, 308, 62 L. R. A., 193, made a basic distinction between ''court'' and ''judge'' in holding that the proof of the genuineness of the standard should be submitted to the jury. The court said: ''The word 'court' in the statutes is used in its generic sense, and includes both judge and jury in a case where a jury is present. It is significant that the statute of 1880, which was obviously copied from the statute of Great Britain enacted in 1854, substitutes the word 'court' for the word 'judge.' '' This case, relied on by the State, is not in point.

An analysis of other cases relied on by the State shows that they either support the holding of this court, in principle, or else are readily distinguishable. For example, the case of *State* v. *Ryno*, 68 Kan., 348, 74 P., 1114, 64 L. R. A., 303, is relied on. The handwriting statute of Kansas (chapter 62, section 1427, Revised

Statutes) is utterly different from our statute. It does not provide that the standard offered be found genuine by the judge. The inapplicability of *State* v. *Ryno* is demonstrated when the language of the Kansas statute is considered. That statute reads as follows:

"Persons of skill, or experts, may be called to testify as to the genuineness of a note, bill, draft, certificate of deposit or other writing; but three witnesses at least shall be required to prove the fact, except in case of a larceny thereof, the single evidence of the president, cashier or teller of the bank purporting to have issued the same, or the maker thereof, may be received as sufficient."

It would extend this memorandum beyond all reasonable bounds were we to attempt to consider separately the other cases cited in the brief for the State. Counsel for defendants have fully discussed these cases in their brief, to which we make reference.

Under our statute there can be no doubt that it is the duty of the judge alone to determine the genuineness of a writing offered as a standard of comparison. His decision on this question is final, when supported by material evidence, and is not subject to review or reversal by the jury.

The second contention is, in effect, that even if the trial judge was in error in permitting the jury to determine the genuineness of the standards of comparison, no prejudice thereby resulted to defendants. Section 10654 of the Code is invoked, which section, in substance, is that no reversal for errors not affecting the result of the trial will be granted. This contention ignores the fact that the testimony given by the large number of witnesses as to the genuineness of the stand-

ards was incomplete to go to the jury under chapter 22, Acts 1889, and could have, as said in *University of Illinois* v. *Spalding; supra,* but served to "confuse and distract the jury." The position of the State would do away with our handwriting statute, for it could always be argued that no prejudice resulted in addressing the evidence to the jury when it reached the same conclusion as to genuineness as had the judge. But substantially the only evidence offered connecting defendants with the offense charged was that of the expert, Walter.. His testimony could only be received in strict compliance with the requirements of chapter 22, Acts 1889. To throw in along with his testimony the testimony of the witnesses as to the genuineness of the standards, not direct evidence upon the merits of the case, and entered collateral thereto, was essentially prejudicial to defendants.

The point is, however, that the condition under which writings offered as a standard may be proved was not observed. The question of genuineness was left to the jury. Without a strict observance of the requirements of the statute, the expert, Walter, was without right to make comparisons. This court said in *Franklin* v. *Franklin,* 90 Tenn., 44, 16 S. W., 557, 558, that this statute "should be strictly construed." It can scarcely be rated a technicality for this court to give force and effect to a solemn act of the Legislature. Except for the act, the State would have been unable to proceed with its case. Having invoked the act, it must be held to the necessity of taking it as written.

Petition overruled.