THE STATE OF KANSAS v. ISAAC POTTER.

1. CRIMINAL LAW; *Evidence; Character of Accused.* On a trial for murder, it is error to permit the state in the first instance, and as a part of its case, to offer testimony showing the character or reputation of the deceased as a quiet and peaceable man.

2. ———— *Statements of Deceased; Hearsay.* Where the deceased and defendant had two affrays in the same afternoon, the interval between which was about an hour, and during such interval were out of the sight and hearing of each other, though driving along the same road on the way to their respective homes, *held,* that the second affray was not a continuation of the first to such an extent as to make competent evidence of the statements of the deceased, or his comrades, in such interval, and in the absence of the defendant, as to what had happened, or what he thought the intentions of the defendant were.

3. ——— *Self-Defense.* In order to establish that a homicide was committed in self-defense, it is not essential that the defendant show that deceased *actually* had a deadly weapon. It is sufficient in that respect if he show that the conduct of deceased was such as to induce a reasonable belief that he had one.

## *Appeal from Atchison District Court.*

INFORMATION for murder in the second degree against *Isaac Potter,* George Potter, and Walter Boyle, charging them with killing one Jacob B. Keeley. *Isaac Potter* demanded a separate trial, and the case against him was tried at the June Term 1874. The testimony complained of is stated in the opinion, *infra.* The district court gave some twenty special instructions at the instance of the prosecution, of which the 2d and 15th are as follows:

" 2d.—If the jury find from the evidence that the defendant Isaac Potter at the time he assailed the deceased did so with intent to kill him, or if after attacking the said deceased he conceived an intent to take his life, and with such intent inflicted the wounds upon the person of said deceased from the effects of which he died, and further find that such acts on the part of the defendant were committed purposely and maliciously, and without justification therefor, then, although committed without previous deliberation or premeditation, the jury will find the defendant guilty of murder in the second degree."

"15th.—To justify defendant in taking the life of the deceased, the jury must find from the evidence, not only that the deceased had the means at hand to effect the deadly purpose, but said deceased must have indicated by some act or demonstration at the time of such killing a present intention to carry out such purpose, thereby inducing a reasonable belief on the part of defendant that it was necessary to deprive deceased of his life."

The jury returned a verdict of guilty of murder in the second degree. New trial refused, and defendant was sentenced to imprisonment in the state penitentiary for ten years. Defendant brings the case here by appeal.

*Horton & Waggener*, and *C. F. Cochran*, for appellant:

1. The court should have sustained the motion to quash the information. It does not set forth in plain and concise language and without repetition the offense of murder in the second degree. Crim. Code, § 109.

2. The court erred in allowing the state to introduce evidence of the character of the deceased for being a quiet and peaceable man. This was no issue in the case. It did not in any manner tend to show that defendant "purposely and maliciously" killed Jacob B. Keeley, and could serve no purpose except to prejudice the jury against the defendant: 43 Geo., 128; 46 Miss., 707; 37 Ala., 103; 3 Greenl. Ev., § 27; *Wise v. The State*, 2 Kas., 428. It was not shown that defendant knew the reputation of deceased: 29 Ala., 14. It cannot be contended that it involved any greater degree of moral turpitude in defendant, or made him any more amenable to the law, to kill a quiet and peaceable man, than a desperado, if the killing in either case was done *purposely and maliciously:* 8 Iredell, 344; Wharton's Crim. Law, 172.

It was claimed in the court below, that this testimony was material and proper, as it formed part of the *res gestæ;* but how, or under what circumstances, the character of the deceased entered into and became a part of the *res gestæ*, wherein the killing was done purposely and maliciously, or in any other manner, so far as establishing the guilt of defendant is concerned, we have searched the books in vain to ascertain. (3 Greenl. Ev., § 27.) If such testimony is admissible, by analogy would it not be proper to support the character of a witness for truth before it had been assailed, or prove the character of the accused for violence before evidence of good character had been introduced? (37 Ala., 105.) Would not the character of the accused for violence, etc., form as much a part of the *res gestæ* wherein he was charged with *purposely* and *maliciously* killing another, as the character of the deceased for being a peaceable man? Yet no one will contend that the character of the accused can in any manner

be assailed by the state until put in issue by the defendant himself. This court indirectly passed upon this same question in 2 Kas., pp. 428, 429. But in the case at bar the testimony of the character of deceased was admitted before the state had rested its case; and the defendant at no time attempted to prove the character of deceased, nor was any such testimony offered in his behalf. (37 Ala., 103.)

3. The court erred in admitting testimony of the statements and acts of George Potter previous to said alleged homicide. George Potter was not on trial. Isaac Potter was in no way bound by his statements and acts. Yet the same were permitted to go to the jury as evidence against Isaac Potter. (14 Ohio St., 234; 22 Texas, 605; 3 Greenl. Ev., § 94; 33 Iowa, 553; 51 N. H., 105.)

4. The court erred in permitting the statements of Mike Brannon to Polk Keeley in the absence of defendant, to go to the jury, as evidence against the defendant. It was a conversation between two disinterested parties, and in no sense was it competent to go to the jury as part of the evidence upon which the jury were to acquit or convict defendant of the crime for which he was on trial. (14 Ohio St., 238; 1 Greenl. Ev., § 124.)

The court erred in permitting the witness, Polk Keeley, to testify to the statement as to the intention of defendant made to him by deceased in the absence of defendant. This was so clearly erroneous, it seems unnecessary to do more than call the attention of the court to it. It was simply proving the intention of defendant, by the declaration of another, not made in the hearing of defendant, and long previous to the commission of the alleged homicide, and the court should have sustained defendant's motion to strike out the same. (35 Ind., 492.) The evidence was well calculated to make or induce the jury to believe that the assault was made by defendant without any justification therefor.

5. The court below permitted evidence of the general reputation of Polk Keeley (a witness) for being a quiet and peaceable boy to go to the jury! For what purpose this tes-

27—13 KAS.

timony was material we cannot conceive, unless it was that Polk Keeley, being a *quiet* and *peaceable* boy, was therefore (as argued to the jury by counsel for the prosecution) entitled to some *credit* as a witness! Yet regardless of the absurdity of the proposition, this evidence was permitted to go to the jury as tending to prove that the defendant *purposely* and *maliciously* killed Jacob B. Keeley! The defendant at no time during said trial attempted to prove the character of said witness in any respect, and the motion to strike out said testimony should have been sustained.

6. The court in its general charge to the jury in substance says, that if the jury entertain a reasonable doubt as to whether defendant is guilty of murder in the second degree, but are satisfied that he is guilty of some other grade of the same kind of an offense, then it was their duty to convict him of manslaughter in the first, second, third or fourth degree. In order to convict him at all of an offense less than murder in the second degree, under this instruction, it must be manslaughter in all the degrees.

The court erred in giving instruction No. 2, asked for by the state. The only answer that defendant had to the charge preferred against him, was that he acted in self-defense; that deceased assaulted and attacked him, and that in resisting such attack and assault, it was necessary for him to slay his assailant. Yet the court takes away from him his entire defense by giving this instruction. The court says if defendant "*at the time he assailed*," etc., "*or if after attacking said deceased*," etc. The court could not in much plainer language have said to the jury, that defendant *did assail* and did *attack* deceased. It was not admitted by defendant that he "assailed" or "attacked" deceased; and there was a great conflict of testimony as to who was the assailant. The court assumed in this instruction a fact as *established* which it was the *exclusive* province of the jury to determine from the evidence. (1 Kas., 73; 3 Kas., 486; 49 N. Y., 148.) And by a subsequent instruction (No. 18) asked by the state, the court said in effect, that if defendant voluntarily attacked and as-

sailed deceased, then there would be no justification for the act on the ground of self-defense. The jury is first told that defendant *was the assailant,* and secondly, that, being the assailant, he could not excuse himself on the ground of self-defense. Construing these two instructions together, (and we have no right to assume that the jury did not so construe them,) the defendant might as well have plead guilty to the charge, and saved the formality of a trial. The court may have charged the jury correctly on this point in other instructions, but these instructions being separate and distinct, might they not have been the controlling views with the jury? (1 Kas., 73.)

Inasmuch as the court had given said instruction No. 18, as explanatory of that instruction the court should have instructed the jury as subsequently requested by defendant, as there was evidence that the affray in which deceased was killed, was brought about by deceased. Yet the jury from instruction No. 18, might infer that if defendant had, previous to the alleged homicide, made an assault upon deceased, he was forever thereafter precluded from justifying his killing deceased, on the ground of self-defense, regardless of the time that intervened between his assault upon deceased, and the time he committed the homicide.

7. The court erred in giving instruction No. 15 asked for by the state. In order for the defendant to be justified in taking the life of deceased, it was not necessary for deceased to have the means at hand to slay defendant. If defendant acted from reasonable and honest convictions, that it was necessary to kill deceased, in order to protect his own life, it is well settled that he would be justified, although in fact the danger he apprehended was not real, but merely apparent. (*The State v. Horne,* 9 Kas., 119.) And in order for defendant to be justified in killing deceased, it was not necessary for deceased to have indicated by some act or demonstration at time of such killing a *present* intention to carry out such purpose. (9 Kas., 119.)

*W. W. Guthrie,* for The State:

Enough of the evidence is preserved to show the following facts in the case: Jacob B. Keeley, (the deceased,) his son John, and Mike Brannon, while riding along the road were set upon by the three defendants at Brack's corner, and the boy John injured by a stone thrown by George Potter. The parties here parted. The Potters had been the aggressors, the Keeleys innocent victims. The Keeleys drove on homeward some two miles, where they stop in the road opposite a field where another son, Polk Keeley, is at work. The deceased remains at the wagon, and the two boys go over in the field to Polk. Meanwhile the Potters have followed along the road until they have come in sight of the Keeley wagon, when they leave the wagon by the fence, arm themselves with fence-rails, and move upon the deceased. The boys, Polk and John, go to the aid of their father, and the two parties, each armed, meet in the road, when a combat ensued, and the deceased came to his death at the hands of appellant.

1. As to the character of deceased. He was killed in a renewed encounter which had overtaken him on the road where he had stopped. The state must show such killing to have been purposely and maliciously done. (5 Iowa, 433.) If deceased, smarting under the blows of the first encounter, had stopped to gather help at the first opportunity, and then intercept his former assailants, and they in self-defense had killed him, now no longer an innocent victim but the aggressor, then the state failed in its case. The circumstances which led to that encounter, which entered into the affray, were a part of the *res gestœ;* (23 Iowa, 154–160; 7 Humph., 429; 37 Miss., 327; 5 Geo., 85; 29 Ala., 14; 22 Ala., 39; 50 Mo., 357;) and was so held by this court in *Wise v. The State,* 2 Kas., 428, 429. It is not the question of greater or less moral turpitude, but was it a *crime,* or an act of *self-defense,* and of evidence tending to prove or disprove such fact, or to explain that conduct which, unexplained, would

tend to prove or disprove such fact. Why did deceased go up the road· with a whiffletree in his hand when he saw a large man armed with a rail advancing upon him? and why did his son Polk also advance up the road when he saw three armed men coming down upon his father? and what induced the parties to engage in combat? Was it not part of the *res gestæ* to show the size, age, and character of the combatants? Until this was done, and the conduct of the Keeleys explained, was a case of purpose and malicious killing made out by the state beyond a reasonable doubt? Had the state shown that the Potters had not acted in self-defense? By the same rule that the accused might show deceased a bad man to explain his conduct, and make out a case of justifiable killing, the state might show his quiet disposition to make out a case of unjustifiable killing. In either case, it is only where the case admits of a doubt as to whether the killing was done in self-defense, and may serve to explain the conduct of the deceased, and thus becomes a part of the *res gestæ;* and in such cases all the reported cases agree in holding the evidence proper.

But it is said that this evidence was offered before the state had rested. It was properly offered whenever a foundation had been laid, which might be either by circumstances developed by the testimony offered by the state or the accused.

2. The parties met first at Brack's corner, and two miles further on and two hours later at Albright's field, where without a word the encounter was renewed. Then the first encounter was a part of the *res gestæ;* and the act alone, or word spoken by one of several joint participants is the act of all, and is alike evidence where the trial is severed, as on joint trial.

When it had been shown that Brannon was in the first encounter, had gone into the field and talked with Polk who then engaged in the second encounter, it was evidence to explain away the inference that Brannon had been sent by deceased to obtain the reinforcement of Polk to prepare for a second affray, and that Polk had responded. Both were

interested parties. Polk Keeley was one of the actors in the fatal affray. His acts are a part of the *res gestæ*, as were those of Geo. Potter and Walter Boyle. Two parties engaged in combat; and what might be testified concerning one member of either party is equally competent as to any other of that party. It did not tend to give credit, but was as to a part of the *res gestæ*. But how can this court say that any of such testimony was incompetent in absence of all the evidence in the case, which if preserved might show that the proper foundation had been laid therefor.

3. There was no error as to the instructions. Isolated instructions are not the subject of review. They do not determine the character or effect of the charge or instructions considered as a whole. The defense is *self-defense;* the testimony shows that the defendant was the first aggressor. The defendant testified and admitted that his party made the first assault, but claimed to have done the killing when driven to the wall by the party assailed. These positions are not consistent. No fact was assumed by the court, and the instructions were right.

The opinion of the court was delivered by

BREWER, J.: The appellant was convicted in the district court of Atchison county of the crime of murder in the second degree, and sentenced to the penitentiary for ten years. From this he has appealed to this court, and alleges numerous errors in the proceedings of that court. And first, he complains that that court erred in overruling a motion to quash the information. We do not think the objections made to the information are well founded, and hence see no error in the rulings on the motion to quash. Again, he

1. Evidence of character of deceased.

insists that the court erred in allowing the state to introduce evidence of the character of the deceased as a quiet and peaceable man. It appears that the deceased was killed in an affray — that this was the second quarrel upon the same afternoon between the deceased and defendant, others participating. The first quarrel took place

shortly after the parties left Atchison to go to their respective homes, each in his own wagon, and with two companions. No serious injury was done to either of the parties at this time. At its close the deceased drove ahead with his wagon, and the parties lost sight of each other. After driving some miles the deceased stopped beside a field where one of his sons was at work, and while there the other wagon with the defendant came along, the quarrel was resumed, and in it the deceased was struck on the head and elsewhere with a piece of a rail or club and so injured that he died shortly thereafter. On the trial and before closing their case the prosecution was permitted over objection to ask witnesses who had testified that they knew the deceased, this question: "State if you knew his general reputation for being a peaceable, quiet and law-abiding citizen." And the witnesses testified that he was a peaceable, quiet and law-abiding man. No attack was made by defendant at any time during the trial on the character of the deceased, and no attempt to show that he was a quarrelsome or turbulent man. The question then is fairly presented, whether the prosecution on a trial for murder may, in the first instance, and as a part of their case, show the character and reputation of the deceased. We do not understand counsel for the state as claiming that such testimony is admissible in all cases, but only in cases where there is a doubt as to whether the killing was done in self-defense, and where such testimony may serve to explain the conduct of the deceased and is therefore fairly a part of the *res gestæ*. In such cases it is said that the authorities hold that the defendant may show the bad character and reputation of the deceased as a turbulent, quarrelsome man. See among other authorities, *Franklin v. The State*, 29 Ala., 14; *The State v. Keene*, 50 Mo., 357; *Wise v. The State*, 2 Kas., 429; *The People v. Murray*, 10 Cal., 309. And if the defendant may show that the deceased was a known quarrelsome, dangerous man, why may not the state show that he was a known peaceable, quiet citizen? The argument is not good. The books are full of parallel cases. The accused

may in some cases show his own good character. The state can never in the first instance show his bad character. A party can never offer evidence to support a witness' credibility until it is attacked. The reasons for these rules are obvious. Such testimony tends to distract the minds of the jury from the principal question, and should only be admitted when absolutely essential to the discovery of the truth. Again, the law presumes that a witness is honest, that a defendant has a good character, and that a party killed was a quiet and peaceable citizen, except so far as the contrary appears from the testimony in the case; and this presumption renders it unnecessary to offer any evidence in support thereof. No authorities have been cited sustaining the admission of such testimony, and the following are in point against it: *Bew v. The State*, 37 Ala., 103; *Chase v. The State*, 46 Miss., 707; *Pound v. The State*, 43 Georgia, 128. For the same reasons the court erred in permitting the state to offer evidence of the character and reputation of Polk Keeley, a son of the deceased, who took part in the last affray.

Another error complained of is, in admitting hearsay testimony. The facts are these: The places of the two affrays were about four miles apart. The time between them about an hour. After the deceased had reached the place of the second affray, Mike Brannon and John Keeley, who had been in the wagon with him, got out and went over into an adjoining field where Polk Keeley was at work. When Polk Keeley was on the stand he was asked what Mike Brannon and John Keeley or either of them told him at that time. This question was objected to, but the court overruled the objection. The witness then testified that Mike Brannon told him "that the Potter boys had thrown a rock at father, and hit my brother John Keeley," and "that George Potter claimed that my father had run into Mr. Doyle's wagon, but that he did not." He also testified that his father called to him to come, and said that the Potter boys were going to kill him. At these times the Potter boys were not in sight or hearing. This testimony was admitted

2. Hearsay; not res gestæ.

as a part of the *res gestœ.* In this we think the court erred. The interval between the two affrays was so great, the separation between the parties so complete, that we cannot consider the one a mere continuation of the other to such an extent as to make all the statements and conversations of the deceased and his companions in the interval, and in the absence of the defendant, a part of the *res gestœ.* It seems to us that such testimony was plainly hearsay, and ought not to have been admitted. It seems probable, too, that part of it at least might have prejudiced the case against the defendant.

Appellant also complains that the court erred in giving and refusing instructions. Counsel in their brief call attention to quite a number, and in many instances have pointed out wherein as they think consists the error. We have examined with care the instructions, and considered them with reference to so much of the testimony as is before us in the record, and are constrained to say that so little of the testimony is in the record that it seems wiser not to attempt any extended discussion of the separate instructions. The theory of the defense, as we gather it, was, that the killing was in 3. Self-defense; self-defense; and it seems to us that the court in danger to be apprehended. the special instructions given at the instance of the defendant laid down the law applicable to this defense fully and correctly. Objection is made to instruction No. 15 given at the instance of the state, on the ground that it implies that the deceased must *actually* have had a deadly weapon, and *actually* been in a position and condition to inflict great bodily harm, etc. The actual possession of a deadly weapon may not be essential, if the conduct of the party is such as to induce a reasonable belief that he has one, or is so prepared that he can commit immediately the apprehended injury. Yet the instruction as given may not in view of the actual facts of the case, though erroneous, have misled the jury. Again, instruction No. 2, given at the instance of the state, is criticised as involving a declaration by the court that defendant commenced the affray. While the instruction does not in terms contain such a declaration, yet we think the

language might very naturally convey to the jury the impression that such was the view of the court in reference to the transaction, and unless it was an undisputed fact that defendant commenced the affray, ought to be modified. These are all the suggestions we feel warranted in making, in view of the incomplete condition of the record.

The judgment of the district court will be reversed, and the case remanded for a new trial. The defendant will be returned from the penitentiary, and delivered over to the jailor of Atchison county, there to abide the order of the district court of that county.

All the Justices concurring.