No. 33,876

The State of Kansas, *Appellee,* v. Paul Linville, *Appellant.*

(79 P. 2d 869)

Opinion filed June 11, 1938.

*Frederick G. Apt* and *A. R. Enfield,* both of Iola, for the appellant.

*Clarence V. Beck,* attorney general, *C. Glenn Morris,* assistant attorney general, *J. C. Edwards,* county attorney, for the appellee.

The opinion of the court was delivered by

ALLEN, J.: Paul Linville was convicted of manslaughter in the second degree, and appeals.

It appears that the defendant Linville operated a night club southeast of Iola. On the evening in question one Lanferman arrived at the night club about ten o'clock. Lanferman had been drinking—the evidence was conflicting as to the degree of his intoxication. The defendant undertook to remove Lanferman from the building by way of the door to the northeast room. The defendant testified:

". . . He started to settle down like he was going to fall on the floor. I went around and said, 'Come on, Ab, let's get out of here and get some fresh air.' I put my arm around him. He slipped and fell and threw me over his shoulder. He went down on his head on the concrete and I went clear over his head to the concrete on my hands and knees. I tried to get him up. Two fellows helped Lanferman up. Some one had vomited on the steps. When we fell, I got vomit all over me. Had it all over my hands. I went upstairs, washed my hands and cleaned the vomit off. I put iodine on my shin and shoulder. Lanferman came in in about thirty or forty minutes. . . ."

As to the events that occurred after the return of Lanferman to the house, defendant testified:

"He was staggering around among the people and the tables, covered with vomit. I asked him to leave; about the third time I took hold of his arm and started to the door; when I got to the door with him, he wheeled around; I had my arm around him just as I had before, and as he turned I reached out with my other arm to the jamb of the door to keep from falling out as I did before, and just then he slipped out of my arm and fell out the door, and as he fell I fell right after him. I grabbed the door to keep from falling. I did not push him or hit him. He was not in any condition for anyone to be in and I felt sorry for him. . . ."

Stella Goszdak, a witness for the state, testified:

"Q. Now, you say Mr. Linville was mad? A. He was mad when he pushed him out.

"Q. How do you know? A. I could tell it.

"Q. Well, how? The jury can decide from what you say whether you could tell it. Just tell the jury how you knew he was mad. A. Paul said to me that he had just put up enough with Mr. Lanferman.

"Q. And that's the reason why you thought he was mad, is it? A. Well, he was mad.

"Q. And just tell the jury what he did and how he showed that he was mad. A. Mr. Linville didn't like it because Mr. Lanferman came back in the second time; and right there at the bar, I could tell it on him that he didn't like it. . . .

"Q. . . . Just describe to the jury how Mr. Linville pushed Lanferman out the door. A. He had one arm, one hand, on his shoulder, and with the other arm he pushed him out.

"Q. Do you know with what of Mr. Lanferman's body that the other hand came in contact? A. His left hand was on Ab Lanferman's shoulder, and with the other, his right hand, he pushed him out."

Carl Huckleberry, a witness for the state, stated that the defendant did not appear to be mad.

Wallace Smith, a witness for the defendant, testified:

"I live in Iola; I am employed as a burner at the Lehigh Portland Cement Co. I was at Linville's on the night of the accident. I saw Lanferman about 11:30 or later. We were going home and started out, then I saw Linville escorting Lanferman to the door. It looked to me as if Linville was trying to get him out of there. They were not quarreling or fussing. I just noticed them going out the door. I did not see Linville push Lanferman. He was just taking him to the door. Linville appeared to be disgusted. The next thing I saw was that they were both out doors and Linville said Lanferman was hurt."

There was a cement sidewalk in front of the door. The door was about twenty-four inches above the sidewalk, with three steps leading up to the door.

Doctor Reed testified that when he arrived he found Lanferman unconscious; that he remained in a semiconscious or semicoma condition for a period of ten or twelve days and then died. The doctor stated that upon the first examination he could not tell much about him—whether he was suffering from an injury or the effects of alcohol. An X ray was taken, "but it didn't show a fracture, but from his symptoms he undoubtedly had an injury at the base of the skull."

The information charged the defendant with manslaughter in the second degree under G. S. 1935, 21-411. At the close of the evidence on the part of the state, defendant demurred to its sufficiency to establish the crime charged in the information, and moved for a directed verdict of not guilty. The motion was overruled.

The court instructed the jury as to manslaughter in the second degree, manslaughter in the fourth degree, and simple assault. The jury found the defendant guilty of manslaughter in the second degree.

Defendant contends the court erred in instructing the jury as to manslaughter in the second degree. Our statute G. S. 1935, 21-411, provides:

"The killing of a human being without a design to effect death, in the heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree."

The essential elements to constitute the crime of manslaughter in the second degree specified in the statute, the killing of a human being without a design to effect death in the heat of passion and in a cruel and unusual manner, were neither established by direct evidence nor by legitimate inference. (*State v. Knoll,* 72 Kan. 237, 83 Pac. 622.)

In the definition of manslaughter as homicide committed without premeditation but under the influence of "sudden passion" it has been held that these words mean any intense and vehement emotional excitement of the kind prompting to violent and aggressive action, as rage, anger, hatred, furious resentment or terror. (*Stell v. State* [Tex. Cr. App.], 58 S. W. 75; *State v. Johnson,* 23 N. C. 354, 362, 35 Am. Dec. 742; *Winton v. State,* 151 Tenn. 177, 268 S. W. 633.) We think the words "heat of passion," as used in G. S. 1935, 21-411, have the same significance. The record before us discloses that the defendant Linville and the deceased Lanferman had been friends. There was no evidence of an altercation or angry controversy, the usual concomitants of that degree of emotional excitement known as "heat of passion." One witness stated the defendant was mad; another witness said he was not mad; a third witness stated the defendant appeared disgusted. There was nothing in the demeanor of the defendant to indicate he was acting in the heat of passion in the expulsion of Lanferman. Compare *Steinmetz v. Kelly,* 72 Ind. 442, 37 Am. Rep. 170.

Instruction given to the jury should be based on the evidence in the case. (*Bigelow v. Henniger,* 33 Kan. 362, 6 Pac. 593; *State v. Ryno,* 68 Kan. 348, 74 Pac. 1114.) The facts were simple and there was little dispute in the testimony. Where the question is purely one of law, although arising in a criminal case, it is exclusively for the

court. (*State v. Bowen,* 16 Kan. 475; *State v. Truskett,* 85 Kan. 804, 118 Pac. 1047.)

As the evidence failed to support the charge of manslaughter in the second degree, we think it was error to instruct the jury as to that crime and to submit such issue to the jury. (*State v. Furthmyer,* 128 Kan. 317, 277 Pac. 1019; *State v. Thompson,* 119 Kan. 743, 241 Pac. 110; *State v. Hartsock,* 140 Kan. 428, 37 P. 2d 36.)

As this conclusion requires a reversal of the judgment and the granting of a new trial, it is unnecessary to consider the other assignments of error.

The judgment is reversed, and a new trial is directed.

HARVEY, J., dissenting.