### No. 41,392

STATE OF KANSAS, *Appellee,* v. ENOCH JONES, *Appellant.*

(341 P. 2d 1042)

July 10, 1959. Opinion filed

*Maurice P. O'Keefe* and *Terence D. O'Keefe,* both of Atchison, argued the cause, and *Karl W. Root, Dolan McKelvy* and *Maurice P. O'Keefe, Jr.,* all of Atchison, were with them on the brief for appellant.

*Robert F. Duncan,* County Attorney, argued the cause, and *John Anderson, Jr.,* Attorney General, was with him on the brief for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action in which the defendant, Enoch Jones, was convicted of the crime of manslaughter in the third degree under G. S. 1949, 21-413.

The controlling question on appeal is whether the evidence is sufficient to sustain a finding by the jury that the defendant was *in the heat of passion* at the time he killed another person.

The defendant contends the evidence establishes that the killing was committed in self defense as a matter of law.

The material facts in this case are not in dispute. Enoch Jones (appellant), a colored man, was at the time of the trial fifty-two years of age. He lived in Atchison, Kansas, all of his life and for years had worked for a clothing merchant in Atchison. For the last twelve and one-half years he owned the Lite and Rite Cafe which dispensed food as well as beer. He had never been in trouble and often went coon hunting and kept his hunting clothes, boots, flashlights and guns at the cafe. The guns were kept behind the bar.

On one of these hunting trips shortly prior to the incident in question the defendant froze a toe on his foot and on the night in question was crippled and limped when he walked by reason of this injury.

The defendant's cafe was on South Fourth Street about one-half block from Main Street and approximately four blocks from the police station. Entrance is made from the front of the building on Fourth Street. The building is about seventeen feet wide and had a bar about fourteen feet long and about three feet wide from which beer was served. This bar was located about three feet north of the south side of the building. About six or seven stools were placed up against the bar and there were tables and chairs along the north side of the building as well as toward the west end of the building.

The building is approximately one hundred feet long. The eating counter runs north and south about half way back from the front of the building and is east of the beer bar. There is an opening between the eating counter and the beer bar so that one can walk between and go back to the kitchen and also go out the back way.

On Saturday, March 22, 1958, during the evening the defendant, his two daughters and other patrons were in his place of business engaged in ordinary conversation. One of the other persons was a man by the name of Willie Jones (not in any way related to the defendant, Enoch Jones). About 7:30 p. m., John Oliver, a colored man, approximately six feet three inches tall and weighing about two hundred fifteen pounds, came into the place, obtained a bottle

of beer and then sat at a table with Willie Jones. Oliver had been consuming alcoholic beverage on the day in question. His blood, however, showed but .137% of alcohol at the time of his death.

At approximately 8:15 p. m., on the night in question Oliver and Willie Jones were engaged in conversation when suddenly Willie Jones got up from the table where they were sitting, went out the west front door of the tavern and was followed by Oliver. Approximately five minutes later Oliver returned to the interior of the tavern, had a glass of beer and was not necessarily associated with any of the other patrons within the building until approximately 8:30 p. m., when Willie Jones returned.

Upon Willie Jones' return to the tavern he and Oliver sat at the same table occupied by other patrons of the tavern, including the defendant's two daughters. Conversation between Willie Jones and Oliver resulted in an argument and at that time the defendant told both Willie Jones and Oliver they would have to leave. The argument continued and Willie Jones got up from the table and walked toward the back or east part of the tavern. He was immediately followed by Oliver. Oliver was described as having his right hand in his right front pocket of his trousers as he followed Willie Jones. There in the east part of the tavern Oliver and Willie Jones hesitated for sometime and were apparently engaged in argument. At this approximate time the defendant, Enoch Jones, placed a telephone call to the Atchison police department advising them that there was trouble in his tavern and requested that they come at once. At this same time Willie Jones in a fast walk or run proceeded on the back side of the bar toward the front or west part of the building. He was pursued by Oliver who caught him at the west end of the bar where a scuffle ensued. Both Oliver and Willie Jones were on the floor and Oliver had a pocket knife out and was holding it over Willie Jones' face, who was resisting to avoid being knifed. At this point one of the defendant's daughters came out of the restroom, saw the struggle and struck or grabbed Oliver's hand which held the knife. This interference enabled Willie Jones to get up and flee.

Oliver got up from the floor with his knife in his hand and the defendant said to him "Kid, go on out, I done called the law." The defendant told Oliver at three different times to get out of the tavern. Sometime during the struggle or immediately thereafter, the defendant secured his double-barreled twelve-gauge shotgun

which he had behind the bar, loaded both barrels and laid it across the bar.

The third time the defendant ordered Oliver out of the tavern, Oliver shook his fist in the defendant's direction (in which fist was contained the open pocket knife) and said "go ahead and shoot you black son-of-a-bitch, I don't care for anyone in here," or words to that effect. Oliver kept on walking toward the east end of the bar behind which the defendant was standing, and thereupon the defendant shot Oliver who fell dead in his tracks. At the point where Oliver was standing at the time he was shot, the distance around the east end of the bar to the point where the defendant was standing was approximately twenty feet.

The pathologist who performed the autopsy on the decedent's body on March 23, 1958, removed 186 shot from the body of the deceased. He testified the medial course of these pellets was at an angle of some thirty degrees from the perpendicular, entering the deceased's chest cavity near the right nipple.

The case was submitted to the jury upon instructions which included, among others, three on self defense and one on third degree manslaughter. The jury found the defendant guilty of manslaughter in the third degree as charged in the information, following which a motion for new trial was filed pursuant to G. S. 1949, 62-1723. It was overruled after hearing, and the defendant was sentenced to be confined to the State Penitentiary for a term not to exceed three years. Appeal has been duly perfected presenting the question heretofore stated.

G. S. 1949, 21-413, provides:

"The killing of another in the heat of passion, without design to effect death, by a dangerous weapon, in any case except wherein the killing of another was justifiable or excusable, shall be deemed manslaughter in the third degree."

The defendant contends that under the above statute the burden of proof is upon the state to show that the defendant killed another in the heat of passion. It is argued that there is not one bit of evidence that the defendant was ever mad, or had ever been in a fight with Oliver.

Both parties rely upon *State v. Linville*, 148 Kan. 142, 79 P. 2d 869. The words "heat of passion" were there construed to mean any intense or vehement emotional excitement of any kind prompting violence and aggressive action, as rage, anger, hatred, furor,

resentment or *terror*. While the foregoing case was concerned with manslaughter in the second degree under G. S. 1935, 21-411 (now G. S. 1949, 21-411), it is conceded the words "heat of passion" as used in 21-413, *supra*, has the same meaning.

The defendant further relies upon *State v. Linville*, supra, for the proposition that it is reversible error to instruct the jury as to the crime of manslaughter in the third degree and to submit such issue to the jury when the evidence in the case wholly fails to establish such crime.

Briefly stated, the defendant's position is that the evidence established self defense as a matter of law.

The decision herein requires further examination of the evidence presented at the trial.

The defendant knew that Oliver was not a native of Atchison, having come from the State of Alabama within the past year or two. He also knew that Oliver was a quarrelsome and dangerous man. He knew Oliver had trouble at Carey's Barbecue in Atchison, and when the owner attempted to call the police Oliver threatened the owner at the point of a knife. On another occasion Oliver had beaten the face of the defendant's brother-in-law "to a pulp." The defendant had seen his brother-in-law shortly after the mauling. The defendant was also told of an occasion when Oliver had "one of them dirks" after an individual across the river in St. Joseph, Missouri. Under these circumstances, considering the crippled condition of the defendant, it is argued the defendant had every reason to suspect that his life was in danger as Oliver approached him in a threatening manner with a knife.

The defendant, Enoch Jones, took the witness stand and testified substantially as to the facts heretofore related. Bearing on the question here presented he testified as follows on direct examination:

"Q. Now just tell the jury why you did this shooting?

"A. *I was scared the man was going to come upon me with that knife and kill me and I had no—I couldn't run.*

"Q. That was because of your foot?

"A. That's right.

"Q. This a big man, was he? You don't know why he had the knife on Willie Jones, is that right?

"A. Seen him have the knife right over him. Willie was holding his hand.

"Q. Were you *scared* and *afraid* that he'd either cut you or kill you?

"A. *That's what I was afraid of.*

"Q. And the reason you shot him?

"A. *That's the reason.*

"Q. How many times did you *plead* with him to leave there?

"A. *Three times.*

"Q. And then you had called the police and you told him—

"A. I called the police and told him I had called, to get on out. *All I wanted the man to do so I could continue doing business.*

"Q. *Just take the chair.* You were trying to preserve the peace down there?

"A. I always do.

"Q. Now, tell me, did you get mad at him?

"A. No, I wasn't mad at him or anyone.

"Q. *You were just scared?*

"A. *I was just scared* and I knowed I couldn't get out of his way—from him come up on me with that knife." (Empasis added.)

On cross examination by the county attorney the defendant testified in part as follows:

"Q. You remember what you said to him the third time when you told him to get out?

"A. 'Boy, get out of here'. Pretty sure that's what I said, pretty sure of it.

"Q. What did he say at that time?

"A. Well, *he was walking with the knife in his hand towards me.*

"Q. Enoch, what did he say?

"A. After I told him the third time?

"Q. Yes.

"A. Says—when I laid the gun, he kept coming around towards me—he said, 'shoot me, you so-and-so-and-so-and-so.'

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. But it was after, when John Oliver was here (indicating) you reached over to the back bar into the drawer and got two shells?

"A. That's right.

"Q. Why two shells?

"A. I keep the shells there. Might have to have two, I always load—it is a double-barrelled—

"Q. *You didn't feel that you were in such a big hurry that you should only take time to get one of them?*

"A. I always load two because it is double-barreled.

"Q. Even though you felt a man was going to kill you, you felt that you should take the time to put two shells into that gun?

"A. Wouldn't take you no time to put two shells in, not in double-barreled—

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Enoch, I believe you testified on direct examination that *you thought that this man was after you.*

"A. *I know he was after me.*

"Q. When did you think that he took it into his mind to get after you?

"A. When he got up along that bar and I kept telling him, 'kid, go on out.'

"Q. What makes you think that he conceived the idea at that time or trying to get you or trying to kill you with that—

"A. He *defied my orders* and kept on walking with the knife, towards me with the knife in his hand.

"Q. And because he defied your orders and kept walking, made you conclude that he was after you?

"A. Didn't make no conclusion about it, I would say.

"Q. Well, you shot the man?

"A. *Sure, I shot—I was scared of him. He was going to—he had one man on the floor with a knife over him.*

"Q. And you thought that he was coming at you?

"A. *I was scared he was going to cut me, too,* and I was crippled, I couldn't get out of his way.

"Q. And it was after it became apparent to you then that he was going to come around the bar that you finally determined to shoot him?

"A. *I determined to shoot him because I was scared of him.* He was still walking to me with the knife open, held up in his hand.

"Q. And he was walking at a normal rate of speed?

"A. I would say—I couldn't say the exact speed he was walking but he was walking close to the bar. The chairs, the stools are here (indicating), I am here. It is a narrow aisle and any time he is right there by the stools, he can reach over at least halfway of the bar. The bar is not wide." (Emphasis added.)

There was testimony from the dispatcher for the Atchison police department that on March 22, 1958, a call was received from Enoch Jones at 8:44 p. m., concerning trouble at his tavern and he requested police assistance. Thereupon one officer who was patrolling in the city of Atchison was immediately dispatched by radio and another officer who was at the station was dispatched to the tavern. At 8:45 p. m., on that same evening the dispatcher received another call that a man had been shot at Enoch Jones' tavern. The witness was certain of the time because he kept a log.

The evidence disclosed that Enoch Jones, immediately after shooting Oliver, called the police station and reported the shooting, which occurred prior to the arrival of any police officer at the scene. Officer Lemke testified that Enoch Jones told him immediately after the incident that Oliver was asked to leave but refused, and in the conversation the defendant told the officer "that he shot the black s-o-b. Only he didn't say s-o-b."

Officer Lemke further testified that the head of Oliver's body was facing east upon his arrival and was located toward the east end of the bar with a knife, which had the blade open, still in Oliver's hand. The body was about five feet north of the bar and approximately a foot distant from the stools which were up against the bar.

The chief of police in the city of Atchison, Michael A. Wood, questioned the defendant the night of the shooting. He testified:

"Jones said that the man was causing a disturbance; that he had called the police. The man had broken some of his furniture. He had asked him to get out and the man didn't leave and he shot him."

There was evidence that the back of a chair had been broken off when Oliver and Willie Jones scuffed. On cross examination Wood testified:

"At the police station Enoch told him the reason he shot the man was because he had been causing a disturbance, broke up furniture; that he had a knife in his hand and he wasn't going to let him get close to him to cut him . . ."

After investigation by the police on the night in question the defendant was released to go home. He was not arrested until later when charges were filed.

In 40 C. J. S., Homicide, § 42, pp. 902, 903, the following is stated concerning "heat of passion":

"With few exceptions, an intentional homicide may be reduced from murder to manslaughter only where it was committed in a sudden heat of passion caused by adequate provocation. The requisite passion may be the result of rage, *anger, fright, or terror, and must be of such a degree as would cause an ordinary man to act on impulse and without reflection.*

. . . . . . . . . . .

"The passion ordinarily required to reduce a killing to the grade of manslaughter is that created by rage or anger. However, *the passion may be one resulting from other conditions of the mind rendering it incapable of cool reflection,* such as *fright or terror."* (Emphasis added.)

"Heat of passion" is otherwise defined in 26 Am. Jur., Homicide, § 44, p. 189, as follows:

". . . Voluntary manslaughter is characterized by the doing of the act under the influence of sudden passion without malice. The passion which characterizes voluntary manslaughter does not consist in settled hatred or anything nearly akin thereto; on the contrary, it must be of sudden development. Passion is not limited to rage, anger, or resentment. It may be the emotion expressed by the terms 'fear,' 'terror,' or, according to some decisions, 'excitement' or 'nervousness.' This emotional state, however, it may be expressed, must actually have dominated the slayer at the time of the homicidal act, and it must have been entertained toward the person slain, and not toward another."

The court in *State v. Linville,* supra, reasoned that the prerequisites for "heat of passion" were not there present when it said:

". . . The record before us discloses that the defendant Linville and the deceased Lanferman had been friends. *There was no evidence of an altercation or angry controversy,* the usual concomitants of that degree of emo-

tional excitement known as 'heat of passion.' . . . 'There was nothing in the demeanor of the defendant to indicate he was acting in the heat of passion in the expulsion of Lanferman . . .'" (p. 145.) (Emphasis added.)

Upon the foregoing evidence in the instant case the jury was within its province in finding the defendant guilty of manslaughter in the third degree—that the defendant had killed Oliver in the heat of passion. It was only one minute between the phone call by the defendant reporting trouble at his tavern and the phone call in which he reported that Oliver had been shot and killed. A disturbance was caused by Oliver which necessitated calling the police; furniture had been broken; Oliver defied the defendant's orders to get out of the tavern and the defendant wanted to continue doing business; an altercation took place between Oliver and the defendant in which profane language was used by Oliver to describe the defendant who owned the business; and Oliver approached with a knife in his hand in such a manner as to indicate that he was going around the east end of the bar to attack the defendant who was behind the bar, a course which would have required Oliver to travel approximately twenty more feet before reaching the defendant.

Upon all the evidence the jury was justified in finding an emotional state of mind, described as "heat of passion," dominated the defendant at the time of the homicidal act. It could be said this emotional state of mind was manifested by fear or terror mixed with anger or resentment of such a degree as to cause an ordinary man to act on impulse and without reflection.

While we may not agree with the finding of the jury, upon reviewing the evidence from the cold printed record as we must, nevertheless, to hold as a matter of law the defendant's act in killing Oliver was justifiable or excusable, upon all the facts and circumstances here presented, would invade the province of the jury. The jury heard the witnesses testify, observed the manner in which they testified and observed their conduct and demeanor, particularly that of the defendant. By reason thereof the jury was far better qualified to formulate a proper basis for weighing the evidence and resolving the issue of self defense.

In conclusion it follows that the trial court did not err in overruling the defendant's motion to dismiss the charge of manslaughter in the third degree or in submitting an instruction on such charge to the jury. The verdict of the jury was neither con-

trary to the law nor to the evidence. The judgment of the trial court is affirmed.

JACKSON, J.: (dissenting) I am unable to concur in the opinion of the majority of the court and therefore, in good conscience, must dissent therefrom. There was no real dispute or conflict in the evidence in this case as shown from the record on appeal. It is undisputed that defendant knew that the deceased had seriously injured three people by attacking them; that defendant had witnessed an attack by the deceased with a knife upon another man, which attack had been foiled by defendant's daughter when she was able to shove the deceased and allow the intended victim to escape (see *State v. Potter*, 13 Kan. 414, at p. 425; *State v. Reed*, 53 Kan. 767, Syl. ¶ 11, 37 Pac. 174, 42 Am. St. Rep. 322). It is likewise undisputed that the defendant had called the police on the telephone as soon as the deceased started the aforementioned fight with the other man, and that he told the deceased of this fact as soon as the fight ceased; that defendant then told deceased to leave defendant's cafe.

Instead of leaving, deceased started slowly around the end of the counter waving a knife at defendant; that defendant reached down, got his double barreled shot gun from a place where he had a right to keep it, loaded it, and laid it on the bar; it is likewise established and undisputed that defendant warned the deceased to stop and to get out of the restaurant three times; that deceased only cursed the defendant, struck the top of the bar or counter with his hand holding the knife and came on toward the defendant; that then defendant shot his attacker.

It was further established that defendant is a man of over fifty years of age, some five feet ten inches in height and of medium build; that deceased was six feet three inches tall and weighed at least 210 pounds; that besides this difference in stature, defendant was lame. Certainly, defendant standing behind his own counter in his own place of business had no duty to retreat or to wait until deceased came so close that the shot gun could not be used (*State v. Reed*, supra) and the court so instructed.

But in my opinion, the court's duty did not end there. Had a motion been made for a directed verdict of not guilty, I believe that under the facts, the trial judge would have erred had he refused to give such an instruction since the facts in this record, in

my opinion, show beyond question justifiable homicide by way of self defense. There was a motion to instruct the jury that under the evidence the offense of third degree manslaughter had not been shown. After the verdict, there was a motion for a new trial upon the ground that the verdict was not supported by the evidence. In my opinion, the trial court erred in not sustaining these motions.

The duty of a trial judge, and of this court on appeal, to rule on the law where the facts are undisputed is fully as important as the duty of the jury to render a verdict on conflicting evidence. Both duties go together to make up our ancient system of trial by court and jury. The only limitation upon the power of the court is that it may not direct a verdict of guilty, but it owes a firm duty to direct a verdict of not guilty in a proper case.

The case of *State v. Linville*, 148 Kan. 142, 79 P. 2d 869, concerned a trial under an indictment for mansluaghter in the second degree, and so of course the matter of self defense was not there involved, but the rules of law apply equally to this case. There this court said:

"Instruction given to the jury should be based on the evidence in the case. (*Bigelow v. Henniger*, 33 Kan. 362, 6 Pac. 593; *State v. Ryno*, 68 Kan. 348, 74 Pac. 1114.) The facts were simple and there was little dispute in the testimony. Where the question is purely one of law, although arising in a criminal case, it is exclusively for the court. (*State v. Bowen*, 16 Kan. 475; *State v. Truskett*, 85 Kan. 804, 118 Pac. 1047.)

"As the evidence failed to support the charge of manslaughter in the second degree, we think it was error to instruct the jury as to that crime and to submit such issue to the jury. (*State v. Furthmyer*, 128 Kan. 317, 277 Pac. 1019; *State v. Thompson*, 119 Kan. 743, 241 Pac. 110; *State v. Hartsock*, 140 Kan. 428, 37 P. 2d 36.

"As this conclusion requires a reversal of the judgment and the granting of a new trial, it is unnecessary to consider the other assignments of error.

"The judgment is reversed, and a new trial is directed."

A few of the cases from other jurisdictions announcing the principles of law stated above may be cited: *Ex Parte United States*, (CCA 7) 101 F. 2d 870; *United States v. Murphy*, (CCA 2) 222 F. 2d 698, certiorari denied 350 U. S. 896, 76 S. Ct. 155, 100 L. Ed. 788; *State v. Channer*, 115 Ohio St. 350, 154 N. E. 728; *Mahaffey v. State*, 44 Okla. Cr. 29, 279 Pac. 704; *Commonwealth v. Stringer and Stringer*, 195 Ky. 717, 243 S. W. 2d 944; and see 23 C. J. S. Criminal Law, p. 616, § 1118, and p. 662, § 1145.

It does not satisfy the function of a court to speculate on how the jury could have reached the verdict which it rendered. Per-

haps, the jury became confused by the ambiguous and indefinite meaning of our various statutes relating to the degrees of crime involving homicide (see William L. Rees, Esquire, *Suggested Revisions in Laws Relating to Homicide*, 20 Kansas Judicial Council Bulletin 79).

I feel that the court should grant the appellant a new trial.

I am authorized to state that Mr. Justice ROBB joins in the foregoing dissenting opinion.