No. 45,191

STATE OF KANSAS, *Appellee*, v. MICHAEL JOSEPH MCDERMOTT, *Appellant.*

(449 P. 2d 545)

Opinion filed January 25, 1969.

*John F. Stites*, of Manhattan, argued the cause, and *Richard D. Rogers* and *Donald R. Hill*, of Manhattan, were with him on the brief for appellant.

*John C. Fay*, County Attorney, argued the cause, and *Robert C. Londerholm*, Attorney General, was with him on the brief for appellee.

The opinion of the court was delivered by

FROMME, J.: Michael Joseph McDermott was convicted of first degree murder. A jury imposed life imprisonment and the defendant is serving the sentence in the penitentiary at Lansing, Kansas. His motion for new trial was denied and he has appealed.

McDermott was convicted of murdering his wife, Francis, on September 26, 1966, in Riley county, Kansas. The marital difficulties which culminated in this tragic death began in Iowa and ended in Kansas at the Blue Hills Shopping Center at Manhattan. The wife died as a result of a bullet wound. The bullet was fired from a pistol in the hand of her husband while six witnesses looked on.

The couple were married and lived in Atlantic, Iowa. The marriage occurred in April 1966. In July of that year the wife was hospitalized as a result of a family quarrel. The defendant accused his wife of infidelity and administered a physical beating in an effort toward discipline. In mid-September after leaving the hospital the wife departed from Iowa and came to live with her brother near Manhattan, Kansas.

The defendant remained in Iowa for a time. He purchased the death weapon on September 17. A service station operator in Atlantic testified the defendant picked up a Kansas roadmap and had his car serviced on September 25. While in the station defendant told this witness he was having family troubles and if he couldn't get them straightened out "someone was going to get shot." The following day the defendant drove into a service station north of Manhattan, Kansas, on U. S. Highway 24. He parked his car behind the station in a position where it was concealed from travelers using the highway. His wife was living some distance north of this service station and used the highway in going to and from her work in Manhattan.

His wife left for work that morning at seven o'clock and traveled south on the highway which lead past the service station. A few minutes thereafter two cars careened into the parking lot at the Blue Hills Shopping Center. Six eyewitnesses testified as to what transpired in the parking lot. Their accounts of what occurred were substantially the same.

The defendant and his wife got out of separate cars and an argument ensued. The defendant grasped his wife by the arm and attempted to force her into his car. The wife resisted and begged people in the area to help her. No help was forthcoming. The death weapon was lying on the front seat of the car. Defendant obtained the pistol and a shot was fired from the gun in his hand. The bullet penetrated the wife's left forearm, entered the left breast and penetrated the tip of her heart. The wife slumped to

the ground. The defendant placed her in his car and drove to his brother-in-laws house.

The brother-in-law testified he saw the defendant drive up to his house at 7:25 a. m. The defendant leveled a pistol at him and said, "I'll teach you to mess in my family affairs." The brother-in-law escaped to a neighbor's house. His wife witnessed the incident and overheard the defendant's statement.

The police arrived and took the defendant into custody. Mrs. McDermott lay dead on the floor of the carport. The death weapon was obtained from defendant's pocket.

The resulting trial ended with a sentence of life imprisonment and this appeal which followed is based upon four specifications of error.

The defendant requested a specific instruction that if the jury found the death was by accident they must acquit the defendant. He assigns error on refusal to give requested instruction.

Although the specific instruction requested was not given the matter was adequately covered in the general instructions which set forth and defined the essential elements of first and second degree murder and first degree manslaughter. The jury were instructed they must find the death resulted from an intentional and wilful act on the part of the defendant. They were further instructed:

". . . If you do not find each and every one of these propositions to be true, from the evidence, beyond a reasonable doubt, you must acquit the defendant without further inqury."

The instructions to the jury were adequate on this point.

Defendant contended the killing was in the heat of passion without design to effect death and requested an instruction on third degree manslaughter. The court refused to give the instruction.

The instructions in a criminal case are to be confined to the issues in the case as determined by the charge in the information and the evidence adduced at the trial. Failure to instruct the jury on some lesser degree of the crime charged is not ground for reversal if the evidence at the trial excludes a theory of guilt on the lesser degree of the crime. In *State v. Linville*, 148 Kan. 142, 79 P. 2d 869, it was held reversible error to instruct on second degree manslaughter when the evidence adduced at the trial failed to establish such crime as charged in the information. In *State v. Hockett*, 172 Kan. 1, 238 P. 2d 539, the defendant was charged with robbery in

the first degree and it was held the court was not required to instruct on any lesser degree of the crime when the trial evidence negated guilt of a lesser degree. Similar holdings in first degree murder cases may be found in *State v. Zimmer*, 198 Kan. 479, 426 P. 2d 267, cert. den. 389 U. S. 933, 19 L. Ed. 2d 286, 88 S. Ct. 298, and *State v. Hoy*, 199 Kan. 340, 430 P. 2d 275.

We must next determine the legal meaning and significance of the term "heat of passion." In 1 Wharton's Criminal Law and Procedure (Anderson) § 275 it is said:

"When the defendant seeks to reduce his offense from murder to manslaughter on the ground that he acted in hot blood upon circumstances constituting legal provocation, it is necessary that he show that he was in fact provoked by circumstances constituting legal provocation. If the defendant has voluntarily committed homicide without in fact having been provoked into a passion, he is guilty of murder.

"The passion aroused by the provocation must be so violent as to dethrone the reason of the accused for the time being; it must prevent thought and reflection, and the formation of a deliberate purpose. The theory of the law is that malice cannot exist at the same time as passion of this degree, and that the act of the defendant therefore cannot be considered the product of malice aforethought. Mere anger, in and of itself, is not sufficient, but must be of such a character as to prevent the individual from cool reflection and a control of his actions. . . ." (p. 583)

This court has said the term "heat of passion" includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror. (*State v. Linville*, supra; *State v. Jones*, 185 Kan. 235, 341 P. 2d 1042.) However, in order for a defendant to be entitled to a reduced charge because he acted in the heat of passion his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation.

In the present case the defendant testified he may have been upset but he was not mad or angry at the time. The circumstances surrounding his actions show insufficient provocation to give rise to a condition of "heat of passion" as recognized in the law. Defendant testified that on arriving at the shopping center he and his wife got out of their cars and exchanged greetings. He then asked his wife to get in his car to talk. He expressed his concern over the welfare of his wife's stepchild. The defendant testified as to the subsequent events as follows:

"Q. What happened next, Mr. McDermott?

"A. She reared back, almost threw me off my feet. I said 'Fran, don't go starting that stuff.' I said, 'calm down,' So I took her by the shoulder nice

and easy getting her, wanting her to get into the car. So the same thing while she was trying to get into the car, I said to her, I says, 'Fran,' I said, 'your sister-in-law told me that she don't give a damn about you, but she's deeply interested in that youngster.'

"Q. All right, after this was said, what happened next, Mr. McDermott?

"A. After this when she started into partially into the automobile, all of a sudden that gun was in my hand.

"Q. Where were you standing and where was she standing?

"A. She was standing—with the door open to the car—approximately right up against the car.

"Q. What happened then?"

"A. As I repeated before, when she said—I said to her, 'Fran, what about that youngster?' and with that, that, that split moment, she said 'that's nobody's God damned business,' and when she did the gun went off.

"Q. You had the gun in your hand though?

"A. That is true.

"Q. And it went off.

"A. That is right.

"Q. Mr. McDermott, what happened after that?

"A. I said, 'Fran'—excuse me. 'Fran,' I said, now why did you do that?'

"Q. Well, what happened to her?

"A. She went down, I couldn't hold her. I reached down to pick her up, I thought she had fainted. I reached down to pick her up and I discovered blood on my hands. Then I got to thinking 'I have got to do something quick —what?' I picked her up, placed her in the automobile on the front seat of the car, turned around out of the driveway as fast as I could, thinking of her brother's place, maybe I can locate that place immediately and get her a doctor or a hospital."

The prosecution called six eyewitnesses to this shooting. Their testimony together with that of the defendant excluded any theory that defendant acted in the heat of passion provoked by circumstances constituting legal provocation for such an emotional state. It was not error under the evidence adduced for the trial court to refuse an instruction on third degree manslaughter.

The defendant specifies further error on the part of the trial court in overruling a motion for change of venue. As grounds for said motion he alleged a fair trial could not be had in Riley county because of publicity received from a local newspaper and a local radio station. Two witnesses were called by him and testified in support of said motion. The manager of the radio station testified that his station carried eighteen factual reports of the shooting incident and there was considerable interest in the community for a week or ten days after the incident. The editor of the newspaper testified his paper carried two articles concerning the matter. The exact nature of the broadcasts and of the news articles is not disclosed. Both

witnesses said the people they talked with based their knowledge of the incident upon this publicity. The two witnesses did not disclose the names of the people to whom they talked. No prejudice against the defendant was disclosed by this testimony.

K. S. A. 62-1318 and 1319 provide that a change of venue may be ordered by the judge whenever it shall appear the minds of the inhabitants of the county or of the district in which the cause is pending· are so prejudiced against the defendant that a fair trial cannot be had. K. S. A. 62-1321 provides that an applicant shall set forth the facts upon which the change of venue is based and the truth of the allegations shall be made to appear by affidavit to the satisfaction of the court.

A change of venue on account of prejudice against the accused by the inhabitants of the county in which the case is pending should not be granted unless it is made to appear affirmatively that such prejudice exists as will be reasonably certain to prevent a fair trial. (*State v. Paxton*, 201 Kan. 353, 440 P. 2d 650.)

There were no affidavits and no testimony introduced on the hearing which tended to prove the inhabitants of Riley county were prejudiced against the defendant. The *voir dire* examination of the jury does not appear in the record but there is no claim of difficulty in selecting a jury. The record discloses nothing to indicate prejudice.

The record does not disclose what part of this publicity occurred during the trial. A claim that defendant was deprived of a fair trial by reason of publicity attending the trial proceedings cannot be sustained when defendant fails to show that a single member of the jury was made aware of the publicity; and when it does not appear the publicity was massive, pervasive or disruptive of the trial proceedings. (*State v. Eldridge*, 197 Kan. 694, 421 P. 2d 170, cert. den. 389 U. S. 991, 19 L. Ed. 2d 483, 88 S. Ct. 486.)

The record discloses nothing to indicate lack of a fair trial.

The final specification of error is directed toward statements made by the county attorney in his closing argument to the jury.

The closing argument is not contained in the record on appeal.

The defendant contends the county attorney went beyond the limits of proper argument, inflamed the jury against him and the court erred in not admonishing the jury to disregard such statements.

The statement attributed to the county attorney and admitted by him on oral argument is, "think of the terror of this little girl Jennifer

if this man is allowed to walk the streets . . . don't let him out so he may kill someone else." The evidence at the trial indicated that Jennifer was a stepdaughter of the deceased. She had been present during some of the marital quarrels in Iowa. These quarrels resulted in the hospitalization of Jennifer's stepmother.

The purpose of and limits to proper advocacy before a jury were set forth in *State v. Wilson,* 188 Kan. 67, 360 P. 2d 1092, as follows:

"It is the duty of the county attorney in a criminal prosecution to see that the state's case is properly presented with earnestness and vigor, and to use every legitimate means to bring about a just conviction, but he should always bear in mind that he is an officer of the court, and, as such, occupies a quasi-judicial position whose sanctions and traditions he should preserve. When a prosecuting attorney persists in objectionable argument, as in the instant case, then the court may, and should, declare a mistrial or grant a new trial. (Citing case.) (p. 73)

. . . . . . . . . . . . . .

"The primary purpose of argument by counsel is to enlighten the jury so that they may render a correct verdict, and counsel should not go beyond the scope of legitimate argument, *and his arguments must be confined to the law and the evidence in the case under consideration.* Counsel may indulge in impassioned bursts of oratory, or what he may consider oratory, as long as he introduces no facts not disclosed by the evidence. (88 C. J. S. Trial § 169, p. 337.) In summing up a case before a jury, counsel may not introduce or comment on facts outside the evidence. . . ." (p. 73)

The statements of the county attorney in the present case appear to be confined to proper comment on the law and evidence in the case. This claim of error appears to be more of an afterthought by the defendant. He made no objection to the statements during the argument to the jury. He made no request to admonish the jury to disregard the statements. The contention is without merit.

We find no prejudicial error in the record and the judgment is affirmed.