No. 46,586

STATE OF KANSAS, *Appellee*, v. LONNIE RAY FLOYD, *Appellant*.

(502 P. 2d 744)

Opinion filed November 4, 1972.

*A. J. Focht*, of Smith, Shay, Farmer & Wetta, of Wichita, argued the cause and was on the brief for appellant.

*Reese Jones*, assistant county attorney, argued the cause, and *Vern Miller*, attorney general, *Keith Sanborn*, county attorney, *Larry Kirby*, deputy county attorney, and *Frank H. Jenkins, Jr.*, deputy county attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, C. J.: This in an appeal from a conviction of felonious wounding as defined by K. S. A. 21-435. The material facts as disclosed by the record are not in serious dispute and are presented in their chronological order.

The defendant, Lonnie Ray Floyd, was married and moved to Illinois January 28, 1967. While there he was employed as assistant manager for General Electric Credit Corporation in Mount Prospect, Illinois. He moved back to Wichita, Kansas, in July or August, 1969. He stayed with his father for a time on Douglas Avenue and then moved to 1502 Jump Street, Wichita, where he was living at the time of the occurrence in question. His household goods had not been unpacked. He and his wife were having marital trouble and her whereabouts does not appear in the record.

On Saturday evening, August 16, 1969, Floyd returned to his home at approximately 5:00 o'clock after one or two interviews for employment. He worked on some résumés for a time, purchased some food and later that evening went to his father's home. There was no one at home so he went in and read the paper.

He started home about 12:00 o'clock midnight, but decided to stop at Sunset Lounge, where he had a membership, to have a drink. He had two or three drinks during the evening and played some pool.

At about 12:30 a. m. the complainant, Kenneth Campbell, and Vernon Berry and Thomas Lowe, having finished work at the Cessna Air Craft Company, came to the Sunset Lounge to buy two cases of beer which they intended to take to a friend's house. While they were at the Lounge, Campbell, who did not know Floyd, challenged him to a game of pool. They played two games for $1 a game and Campbell won and Floyd paid him. They then played two games for $5 each and Campbell won both games. Floyd did not have the money to pay Campbell. Floyd suggested he would go out to his car and get a check. Campbell accompanied him. No checks were found. Campbell then took Floyd's pool cue, which was in a broken-down position. Floyd suggested they go to an all-night filling station where he traded and he would cash a check. Campbell kept Floyd's cue in his hand. Campbell rode in the car with Floyd and told Berry and Lowe to drive his car and follow them. When they reached the filling station, Campbell grabbed the keys out of Floyd's car and followed him into the station still holding Floyd's cue. The filling station did not have a blank check. Floyd then suggested they go to another station a mile or two west. When they arrived, the station was closed. Campbell took the keys from Floyd's car and, still carrying the pool cue, went back and talked to his friends. He then returned and told Floyd that his time was up—that he had one more stop, and he had better have the money. Floyd was frightened and while pretending to look for an open filling station, was looking for a police car. Not finding a police car, he proceeded to a place on Luther Street, which was two blocks across the area south from his home on Jump Street —he did not want Campbell and his friends to know where he lived. Floyd was becoming more frightened all the time— Campbell and his friends were talking in loud voices to the effect that his time was up and he better produce a check or they would take his watch and rings. Campbell said the last time a man tried to run out on him, "I split his head open." Before crossing the area between the houses to his residence, Floyd unlocked the trunk of his car and put his house keys in a sack where he had a small caliber gun. He had purchased the gun in Chicago where he

experienced difficulty in a riot and when someone tried to enter his home. Floyd took the sack from the trunk and as he started north to his residence, Campbell said, "If you're not back in five minutes, we're going to get you." Floyd ran to his home—jumping fences—and got a check on a bank in Illinois where he kept an account and also a check on a bank in Kansas City where he had an account while working there after leaving Illinois.

Floyd then came back to the car with the checks and the gun in his pocket. When he arrived at the car, Campbell demanded that he make the check out for $20. Floyd protested, but at Campbell's insistence he made out the check for $20 because he was afraid. Campbell then asked Floyd for some identification. At this point, the testimony of Campbell and Floyd is in conflict, and the record states Campbell testified:

"I was in front of the automobile in a squat position and Mr. Floyd was to my right and had his billfold in his hands showing me his driver's license. It was an Illinois driver's license. He said something to the effect that 'I don't have to take this crap' and the next thing I remember is hearing a gunshot and feeling it. I felt a thud which I assumed was a bullet. At that time I was on the ground. Just before I was shot the defendant was to my right about an automobile length away.

"When I heard the gunshot it took my breath away and I felt something on my left side. After that I got up and ran to the car and I don't know where the defendant was.

"When I got back to the car he was approximately at my right front fender telling Vern Berry and Tom Lowe to stay where they were and pointing what I assume was a gun. He told Berry to stay in the car and said don't get out of the car or I'll shoot you too, or something to that effect. He told me to get in the car and get out of there. I was on the other side of the car opposite to him and opened the door and got in the back seat and told Vern Berry to drive, that I was hurt. We drove to the corner and made a left hand turn and went to the next corner and made another left hand turn and stopped and woke some people up and told them to call the police and an ambulance. While we were standing there we saw the defendant drive by."

Floyd testified:

". . . I pulled out my billfold, and we both went down to the right front of the car. He was next to the car, next to the headlights facing south. I was on the other side of the headlight facing north, facing Campbell. We were real close together there. I had a hold of my billfold, and, he had a hold of maybe the corner of the billfold and he also had the check and he is comparing those and he said, 'Have you got any more identification?' I said, 'Yes,' and I started flipping through my billfold and I have, I don't know maybe five or six credit cards, driver's license, a draft card, social security and I don't recall which ones I showed him and I closed the billfold and was in the process of putting it back in my pocket, and Campbell—well, in the process of Camp-

bell looking at the identification and the check someone yelled out of the car again, 'Why don't you take his watch and rings as collateral for the check,' and I don't think Campbell answered. At this point I was just sticking my billfold back in my pocket and Campbell said, 'I want your billfold too and your credit cards,' and I said, 'Oh, no,' I said, 'You're not taking my billfold or my credit cards,' and I just got through placing the billfold in my pocket. He reached up and grabbed me around the neck or the throat and he threw me up against the front of the car. I was half on the car and half on the pavement. I really don't know what was supporting me, either the car or the pavement, and he, I don't know, was trying to strangle me or choke me or something, and I got scared and I threw my left arm out at him and kind of shoved him away and back up and at the time I was backing up I pulled the gun out of my pocket and I said, 'Hold it.' He paused for a second and he leaped at me, and I jumped back, and that is when the gun discharged, and he fell right by me, slumped by me . . ."

Campbell's friends helped him into his car, and Floyd testified:

". . . [A]t this point they said, 'We have your license number,' and they said either, 'I'm going to kill you for this,' or, 'We're going to get you for this,' and they drove off. I put the gun back in my pocket and . . . got in my car, turned to the left there at that deadend street, went down the first block to the right, turned right again, went back over to Jump Street and went home."

Floyd further testified that as he drove home he passed Campbell's car where it had stopped to call an ambulance. He was scared and does not remember what he did for awhile. He stated,

". . . I had visions of them coming back to get me and I turned all the lights out in the house and just waited and watched."

Floyd called his attorney that same morning. His attorney told him to stay in the house and do nothing. The attorney called back and said he had talked to Detective Moreland and had arranged for a meeting of the three of them Monday morning at 9:30 o'clock. Floyd dressed and went to church and then decided to go to the races. He was about two blocks from home when he started to return for his rings and watch which he had forgotten. He was then arrested by Detective Moreland. The arrangement for the Monday morning meeting with the police was not disputed.

Floyd was asked and he answered the following questions:

"Q. After you called your attorney were you acting on his advice from that point forward?

"A. Yes.

"Q. And you knew that this following Monday then that you were going to go down and talk to the police?

"A. Yes."

Floyd was charged with felonious assault as defined by K. S. A. 21-431. He was convicted of the lesser offense of felonious wounding as defined by K. S. A. 21-435. He was sentenced to one year in the Sedgwick County jail and placed on probation. The defendant then perfected this appeal.

Appellant's statement of points raise thirteen claims of trial errors. Point No. 6 reads:

"The court should not have instructed the jury as to flight since there was no evidence that the defendant fled to support such an instruction and it was contrary to the evidence of both plaintiff and defendant."

If the appellant is correct in this contention, other alleged errors will not require attention. The district court instructed the jury:

"You are instructed that flight raises the presumption of guilt. Therefore, if you find from the evidence that the defendant, soon after the commission of the offense alleged in the Information, fled to avoid arrest and trial, you may take that fact into consideration in determining his guilt or innocence. His flight, if he did flee, is not sufficient in itself to establish guilt, but a circumstance which you may consider in determining the probabilities of his guilt or innocence. The weight to which that circumstance is entitled is a matter for the Jury to determine in connection with all the facts brought out in the case.

"The defendant has a right to explain his flight upon some theory; and you are to say whether there is a sufficient explanation of it in this case. If he fled and his flight is unexplained, the law says it is a fact that may be taken into account against the defendant upon the theory that one's conscience teaches him to know whether he has done right or wrong in a given cause."

The appellant contends the first sentence of the instruction is erroneous as a matter of law. We so held in *State v. Moffitt,* 199 Kan. 514, 524, 431 P. 2d 879, where a similar instruction was given; however, we also held that the instruction did not prejudice the rights of the appellant.

The contention in the instant case presents a more serious question. A careful review discloses no evidence that the appellant "fled to avoid arrest and trial." The evidence is to the contrary. He left the scene and went two blocks to his home because he was afraid of Campbell and his companions. That was early Sunday morning. He called his attorney and arrangements were made for him to contact the police Monday morning. He then went to church and upon returning, called his younger brother about going to the races. His brother was not at home, so he decided to go alone. He was acting on his attorney's advice and knew Monday morning

he was "going down to talk to the police." The testimony was corroborated by Detective Moreland who testified:

"Prior to the time I set up surveillance on Mr. Floyd's house I was contacted by a lawyer that said he was Mr. Floyd's lawyer. He told me that he'd have Mr. Floyd in my office on Monday morning for me to talk to. It is not my responsibility to wait for people to be brought to me, my job is to find people immediately. That is what I was doing there."

It is always improper to instruct a jury upon matters which are not in issue, even though the instruction correctly states the law. But this error of the court does not require a reversal unless it can be said that it was prejudicial to the rights of the defendant. (*State v. Thompson*, 119 Kan. 743, 241 Pac. 110.)

In *State v. Linville*, 148 Kan. 142, 79 P. 2d 869, it was held:

"Instructions given to the jury should be based on the evidence in the case, and *held*, it is reversible error to instruct the jury as to the crime of manslaughter in the second degree and to submit such issue to the jury when the evidence in the case wholly fails to establish such crime." (Syl. ¶ 1.)

The rule has been applied in a civil case where an instruction was given on unavoidable accident. (*Paph v. Tri-State Hotel Co.*, 188 Kan. 76, 360 P. 2d 1055.) In the *Paph* case the court stated:

"After a careful review of the evidence the court has concluded there is nothing in the record presented to indicate anything other than that the accident in question was caused by the negligence of one or the other, or both, of the parties involved in the action. Moreover, in the face of that situation, it is convinced the decisions to which it has referred throughout this opinion compel a conclusion the submission of the instruction on unavoidable accident was prejudicial error which required the granting of her motion for a new trial." (l.c. 84.)

The posture of the case now before us, particularly the question of self defense, was such that the giving of the instruction on flight to escape arrest and trial without evidence of such flight affected the substantial rights of the defendant and constituted prejudicial error.

The judgment is reversed with instructions to grant a new trial.